# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

United States of America ex rel.
TINA MARIE GONTER and
CHARLES WILLIAM GONTER,
bringing this action on
behalf of the United States
of America

        Plaintiffs and Relators,

    vs.

GENERAL DYNAMICS,
MARINE SYSTEMS DIVISION,
ELECTRIC BOAT
75 Eastern Point Road
Groton, Connecticut 06340-4989

    and

Northrop GRUMMAN NEWPORT
NEWS, *formerly known as*
NEWPORT NEWS SHIPBUILDING
4101 Washington Avenue
Newport News, Virginia 23607

    and

MORPAC INDUSTRIES
117 Frontage Road North Suite A
Pacific, Washington 98047-1052

    and

LOCKHEED MARTIN CORP.,
LOCKHEED MARTIN,ENERGY
SYSTEMS, INC., and
LOCKHEED MARTIN UTILITY
SERVICES, INC.
6801 Rockledge Drive
Bethesda, Maryland 20817

    and

Civil Action No. 4:01CV634

Judge Dan Aaron Polster

Magistrate Judge
James B. Gallas

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

HUNT VALVE COMPANY, INC.                     :
1913 East State Street                       :
Salem, Ohio 44460                            :
                                             :
          and                                :
                                             :
                                             :
ALL-STAINLESS, INC.                          :
75 Research Road                             :
Hingham, Massachusetts 02043                 :
*c/o Agent for Service of Process*           :
*Nicholas Roundtree*                         :
*992 Temple Street*                          :
*Whitman, MA 02382*                          :
                                             :
          and                                :
                                             :
LAWRENCE KELLY                               :
12123 Donnelson Road                         :
Arlington, TN, 38002-9507,                   :
                                             :
          Defendants.                        :

## CONTENTS

I.   INTRODUCTION AND SUMMARY OF ALLEGATIONS . . . . . . . . . . . . . . . . . 1

II.  JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     A.   Relevant Non-Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.  FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

     A.   The Current Status of Hunt Valves Delivered to the Navy . . . . . . . . . 16

     B.   The Navy Prime Contractor Defendants . . . . . . . . . . . . . . . . . . . . . . 19

          1.   General Dynamics Electric Boat's Knowledge of
               Hunt Valve Company's Fraudulent Practices . . . . . . . . . . . . . . 22

          2.   Northrop Grumman Newport News Shipbuilding's
               Knowledge of Hunt Valve Company's Fraudulent Practices . . . 36

          3.   MORPAC Industries' Knowledge of Hunt Valve
               Company's Fraudulent Practices . . . . . . . . . . . . . . . . . . . . . . 52

     C.   Defendants Lockheed Martin (LM), Lockheed Martin Energy
          Systems (LMES), and Lockheed Martin Utility Services (LMUS) . . . . . 53

          1.   Lockheed Martin's Operation and Management of Gaseous
               Infusion Plants for the United States Department of Energy . . . 53

          2.   Lockheed Martin's Knowing Failure to Comply with
               Contractual Requirements . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

          3.   Defendant All Stainless, Inc. as a Sham Distributor of
               Hunt Valves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

          4.   The Nonexistence of Hunt's Quality-Assurance System . . . . . . 64

          5.   Falsification of Performance-Testing Certifications . . . . . . . . . . 71

          6.   Nonconformances Pertaining to Nondestructive Testing . . . . . . 73

          7.   Nonconformances in the Reporting of Nondestructive
               Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

i

8.     Testing Performed in Violation of Specification . . . . . . . . . . . . 79

9.     Welding Performed in Violation of Military Specifications . . . . . . 81

      a.     Certain Violations of MIL-STD-248 . . . . . . . . . . . . . . . . 82

      b.     Certain Violations of MIL-STD-278 . . . . . . . . . . . . . . . . 83

      c.     Certain Violations of MIL-STD-271 and MIL-STD-2035 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

10.     Failure to Maintain Required Traceability of Parts . . . . . . . . . . . 90

11.     Unqualified Personnel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

12.     Failure to Require Vendors to Conform to Contract, and Falsification of Vendor Certifications . . . . . . . . . . . . . . . . . . . . . 94

13.     Allegations Regarding Production of UF6 Valves . . . . . . . . . . . . 95

      a.     Certain QC-21 Audit Violations . . . . . . . . . . . . . . . . . . . . 96

      b.     Certain QC-6 Control of Non-Conforming Material Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

      c.     Certain QC Procedure AIT-1 Training Violations . . . . . . . 99

      d.     Violations of ANSI N14-1 Requirements . . . . . . . . . . . . 101

COUNT I:  False Claims Act—Military Valves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

COUNT II: False Claims Act Conspiracy—Military Valves . . . . . . . . . . . . . . . . . . . 103

COUNT III: False Claims Act Conspiracy—Military Valves . . . . . . . . . . . . . . . . . . . 104

COUNT IV: False Claims Act Conspiracy—All-Stainless "Distributorship" . . . . . . . 105

COUNT V:  False Claims Act—UF$_6$ Valves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

COUNT VI:  Retaliation against Tina Marie Gonter . . . . . . . . . . . . . . . . . . . . . . . . . 106

COUNT VII:  Violation of Ohio Public Policy-Tina Gonter . . . . . . . . . . . . . . . . . . . 109

COUNT VIII:  Retaliation against Charles William Gonter . . . . . . . . . . . . . . . . . . . 110

COUNT IX:  Violation of Ohio Public Policy-Charles Gonter . . . . . . . . . . . . . . . . . 113

ii

Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

# I. INTRODUCTION AND SUMMARY OF ALLEGATIONS

1.      This is an action to recover damages, civil penalties, and other relief from Defendants for causing great harm to the United States by (1) falsely certifying that valves manufactured for use in submarines and surface vessels of the United States Navy conformed to contract requirements, when in fact they did not; and (2) falsely certifying that valves on containment vessels for depleted uranium hexaflouride ($DUF_6$) conformed to contract requirements, when in fact they did not.

2.      All valves at issue in this case were manufactured and/or assembled by Hunt Valve Company (hereinafter "Hunt") and then sold or delivered to the United States by one of Hunt's prime-contractor customers.  Since at least the mid- to late 1980s, Hunt has manufactured and assembled valves which it knew failed to conform to requirements and specifications of government contracts in myriad ways, most of which constitute systemic failures in Hunt's engineering, quality, and manufacturing systems.  These include by way of example the following:

    a.      Inadequate and effectively non-existent quality control systems;

    b.      Failure to promulgate required quality assurance systems;

    c.      Inadequate receiving inspection of materials;

    d.      Falsification of required quality control documents;

    e.      Falsification of required nondestructive testing documents;

    f.      Falsification of required product inspection documents;

    g.      Performance of ultrasonic testing without an approved procedure;

    h.      Falsification of required records purporting to show that material contained in valves is traceable to its source, when it is not;

    i.      Falsification of records purporting to show that welding was performed

1

consistent with contract requirements, when it was not;

j.  Falsification of records purporting to show that required weld joint records were properly generated and maintained, when they were not;

k.  Performance of welding by unqualified and uncertified welders;

l.  Marking of materials by vibro-etching to reflect the performance of inspection operations which were never performed;

m.  Falsification of records purporting to show that welding was done by qualified personnel, when it was not;

n.  Performance of weld repairs in a manner not authorized by contract and military specification;

o.  Falsification of records purporting to show that weld repairs were not performed when they in fact were;

p.  Falsification of records purporting to show that weld repairs were properly performed when they in fact were not;

q.  Falsification of records purporting to show that weld repairs were classified as "minor" when in fact they should have been classified as "nominal" or "special," which Hunt personnel also call "major";

r.  Performance of nondestructive testing by unqualified personnel;

s.  Performance of the wrong nondestructive testing method while falsely representing that the correct testing method was utilized;

t.  Falsely certifying that nondestructive testing was conducted by qualified personnel, when it was not;

u.  Performing magnetic particle inspections on plated components without removing the plating, thereby invalidating the inspection, while certifying that proper test methods were used;

v.  Conducting of inspections by unqualified personnel;

w.  Falsely certifying that inspections were conducted by qualified personnel, when they were not;

x.  Falsely certifying that inspections were conducted, when they were not;

y.  Falsely modifying documents to reflect that valves were made to

2

contractually-required drawing revisions when in fact they were made to previous, outdated drawing iterations;

z. Using uncalibrated or improperly-calibrated testing and measuring equipment while certifying that calibrated testing and measuring equipment was used;

aa. Using foreign substances, to include fingernail polish and coffee, to falsely represent that valves conformed to contract requirements when they did not;

bb. Using, or subcontracting for the use of, foreign substances to impregnate the bodies of valves so they would pass hydrostatic testing, in violation of contract requirements;

cc. Failing to conduct required audits of vendors;

dd. Failing to conduct internal audits at required frequencies;

ee. Failing to address audit findings made during rare internal audits;

ff. Using scrapped material for subsequent production;

gg. Substituting nonconforming materials for materials required by drawing;

hh. Changing materials from those required by contract, while certifying that conforming materials were used;

ii. Using manufacturing operations different than those required by drawing without pursuing required, formal design changes;

jj. Selling valve designs known to be defective;

kk. Changing valve torque values from those required by contract, while falsely certifying that conforming valve torque values were used;

ll. Falsely certifying that measuring devices, to include calipers, torque wrenches, and others, were properly calibrated when they were not;

mm. Falsifying certifications from vendors in order to create the appearance that vendor-supplied material can be traced to its origin;

nn. Using nonconforming fasteners, while certifying that conforming fasteners were used;

oo. Using the wrong welding rod, while certifying that the correct welding rod

3

was used;

pp.  Using the wrong weld procedures, while certifying that the correct weld procedure was used;

qq.  Failing to advise the United States of defective $UF_6$ valves, in violation of federal criminal law;

rr.  Falsely certifying that $UF_6$ valves were manufactured and assembled under Nuclear Quality Assurance standard NQA-1, when no NQA-1 program is or ever has been in place; and

ss.  Defeating product traceability by failing to include sublot designations on heat treatment records.

3.  Hunt customers, to include among others, defendants Electric Boat, Newport News Shipbuilding, and MORPAC Industries, sold, or caused to be sold, defective mission-critical and other valves to the United States Navy in the course of performing obligations and receiving money under government contracts.  Each of these defendants knew, or were recklessly indifferent to the fact, that Hunt valves sold or delivered to the United States were not properly manufactured and assembled, and that Hunt failed in myriad ways to utilize and enforce the quality-system requirements which are mandated by all contracts pursuant to which these valves are made.

4.  Nonconforming valves have, within and before the entire limitations period, been sold and delivered to the United States in two ways.  First, nonconforming valves were sold and delivered directly to the United States by Hunt as spares.  Second, nonconforming valves were sold and delivered to the United States as part of finished equipment or as spares by prime contractors, including General Dynamics Electric Boat Division ("Electric Boat" or "GDEB"); Northrop Grumman Newport News, formerly known as Newport News Shipbuilding ("NGNNS" or "NNS"); and MORPAC Industries.  These and other contractors contract with Hunt to manufacture and deliver

4

Hunt valves in absolute conformance with contract requirements.

5.      Defendants certify to the United States that valves manufactured and/or assembled by Hunt conform to drawings, specifications, contract requirements, and quality procedures when they do not.

6.      Hunt, through an authorized employee who more often than not was a Certification Adminstrator, usually either Carol Cox or Nancy Feezle, executes and delivers Certificates of Compliance which represent that the valve or valves to which the Certificate correlates conform to all contract and drawing requirements.

7.      Each and every Certificate of Compliance signed by Hunt personnel in connection with military and uranium hexaflouride containment valves within the limitations period is a false document.  Where the product represented by those Certificates ultimately is delivered to the United States or a United States-funded foreign military, then those Certificates are false documents which were used by Hunt and Hunt's customers to get a false claim paid by the United States.

8.      Electric Boat, NNS, and MORPAC certify to the United States, or to a contractor in the shoes of the United States as set forth in 31 U.S.C. § 3729(c), that the valves, and/or the vessels or assemblies in which the valves are contained, conform with required drawings and specifications and were manufactured, assembled, and tested in accordance with contractually-required procedures, despite their knowledge, deliberate ignorance, or reckless disregard of Hunt's failure to conform to those requirements.

II.     **JURISDICTION AND VENUE**

9.      This action arises under the United States False Claims Act, 31 U.S.C.

§ 3729 *et seq.*

10. This Court has jurisdiction pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

11. There was not, prior to the filing of the complaint in this case, any "public disclosure" of the false transactions identified herein as that term is used in the False Claims Act, 31 U.S.C. § 3730(c)(4)(A).

12. Relator Tina Marie Gonter has direct and independent knowledge of the allegations set out in this Amended Complaint, and she voluntarily provided all such information, together with supporting documentation, to the United States Department of Defense before filing this false claims action, except that information regarding events which occurred after the filing of the original Complaint herein was voluntarily provided to various agencies of the United States before the filing of this Second Amended Complaint. She therefore is an original source as that term is used in the False Claims Act, 31 U.S.C. § 3730(d)(4)(B).

13. Relator Charles William Gonter has direct and independent knowledge of many of the allegations set out in this Amended Complaint, and he voluntarily provided all such information to the United States Department of Defense before filing this false claims action, except that information regarding events which occurred after the filing of the original Complaint herein was voluntarily provided to various agencies of the United States before the filing of this Second Amended Complaint. He therefore is an original source as that term is used in the False Claims Act, 31 U.S.C. § 3730(d)(4)(B).

14. Venue is proper with respect to all parties in the United States District Court for the Northern District of Ohio, Eastern Division, pursuant to 28 U.S.C.

6

§ 1391(b), (c) and 31 U.S.C. § 3732(a) because all Defendants transact business in this District and Division and because relators, during all times material to this matter, were employed in this District and Division.

## III.  PARTIES

15.    Relator Tina Gonter was hired by Hunt as a Quality Assurance Manager in November 2000.  She was terminated from that position on or about August 23, 2001, in retaliation for her conduct of activities related to this civil action.  Ms. Gonter was employed from 1982  to 1996 by the United States Department of Defense in the Quality Assurance Department of Norfolk Navy Shipyard.   She completed a four-year quality assurance apprenticeship with the Department of the Navy.  She holds or has held Level 2 certifications in Radiographic Inspection, Material Certification, Visual Inspection, Magnetic Particle Inspection, Liquid Penetrant Inspection, and Precision Measurement Devices.  Ms. Gonter has other areas of training and/or certifications including ISO 9000, Supplier Source Inspections, QC Marking and Material Verifications, Receipt Inspection, Level 1 Material Handling, Storage, Inspection and Certification, Valve Repair Inspection, Hydrostatic Testing, Welding Procedures and Joint Design.

16.    Relator William Gonter was hired by Hunt as a Quality Assurance Specialist in March 2000.  He  was constructively discharged by Hunt in October 2001 after Hunt created a hostile work environment upon learning that Mr. Gonter had cooperated with the Department of Defense in its investigation of Hunt.   Mr. Gonter was employed by the United States Department of Defense ("DOD") from 1972 until 1996.  As part of his employment with DOD, Mr. Gonter worked 16 years in the Quality

7

Assurance Department of Norfolk Navy Shipyard.  Mr. Gonter has other areas of training and/or certification including ISO 9000, QC Marking and Material Verifications, Receipt Inspection, Material Handling, Storage, Inspection and Certification, Valve Repair Inspection, and Hydrostatic Testing.

17.    Defendant Hunt is a Delaware corporation with its principal place of business in Salem, Ohio.  As relevant here, Hunt's Military Division supplies valves for use in at least five Navy weapons systems, including *Seawolf* submarines, *Virginia*-class submarines, DDG-51 AEGIS-class *Arleigh Burke* guided missile destroyers, CVN nuclear-powered aircraft carriers, and the LPD-17 amphibious transport dock.  Within the limitations period, Hunt sold approximately 40,000 valves to prime military contractors and as spares to the Navy.

18.    About 15,000 of those valves were subject to Level 1/SUBSAFE program requirements.  SUBSAFE  stands for "Submarine Safety."  The SUBSAFE Program was designed by the Navy to provide maximum reasonable assurance that seawater is kept out of a submarine and that a submarine could recover from a flooding casualty in the event of failure.  The Navy designates certain areas known as "SUBSAFE boundaries" within submarines.  A "Level1/SUBSAFE" designation is the highest level of classification in the procurement process and requires "objective quality evidence" ("OQE") that the valves meet all material and testing requirements set forth in contracts and purchase orders.  The Navy pays a premium for compliance with Level 1/SUBSAFE requirements, including the ability to maintain traceability of every component to its birth.

19.    According to the website of the Naval Sea Command (NAVSEA), " Level

1/SUBSAFE materials are intensively managed and controlled and are required to be certified with traceable objective quality evidence. Items include submarine hull pressure boundary fittings, high pressure air and gas components, high pressure/ temperature steam system components and selected safety related equipment on surface ships and submarines." http://www.nslc.navsea.navy.mil/ EngD&A/ACQEng/LI_SS.htm.  The same NAVSEA website states that "Failure of a Level 1/SUBSAFE [component] could result in a loss of life, affect mission of ship, or the loss of the ship itself."

20.     Hunt also supplies valves for use at facilities owned and operated by the United States for storage tanks which contain depleted uranium hexaflouride ("UF$_6$"), which is the waste remnant of the form of uranium used in the process of uranium enrichment for use as nuclear fuel.  These valves are subject to quality assurance and nuclear safety requirements under NQA-1, 1989 and nuclear safety requirements under 10 CFR Part L1.  Hunt supplied more than 20,000 such valves in the time period 1990 through 2001.

21.     Defendant Electric Boat is a Delaware corporation with its principal place of business in Groton, Connecticut.  Electric Boat is a division of General Dynamics and is a prime contractor to the United States Navy for *Seawolf* and *Virginia* class submarines, and other vessels.  Electric Boat has purchased and installed in vessels of the United States thousands of nonconforming Hunt valves throughout the entire limitations period and before.

22.     Defendant Northrop Grumman Newport News was until November 2001 a separate company called Newport News Shipbuilding.  It is an operating division of

9

Northrop Grumman Corporation, a Delaware corporation with its principal place of business in Los Angeles, California, and is engaged in the design, construction, repair, overhaul and refueling of nuclear-powered aircraft carriers and submarines for the United States Navy.  NNS purchased and installed many defective Hunt valves over a period of many years.

23.     Electric Boat and NNS included Hunt Valve product in at least six Navy programs including *Los Angeles*-class Submarines, *Seawolf*-class Submarines, *Virginia*-class Submarines, DDG-51 class Destroyers, CVN Aircraft Carriers, and the LPD-17 Amphibious Transport Dock.

24.     Many of the valves sold to the United States by Electric Boat and NNS are used in the manufacture, repair and refitting of *Seawolf* and *Virginia* class submarines, and nuclear aircraft carriers covered by, without limitation, the following contracts:

```
N00104-96-P-VP70
N00104-97-P-FC23
N00104-97-P-BE30
N00104-97-P-BD87
N00104-97-P-FE58
N00104-97-M-B012
N00104-97-C-FA72
N00104-98-G-7001
N00104-98-P-BA36
N00104-98-P-BA13
N00104-99-P-SL63
N00104-99-P-FK08
N00104-00-P-BC90
N00104-00-P-BC91
N00104-00-C-FA52
N00104-01-C-7004
NNS450-00-2-7349
```

25.     Defendant Lockheed Martin Corporation ("Lockheed Martin") is a Maryland corporation with its principal office and place of business located at 6801

Rockledge Drive, Bethesda, Maryland. Lockheed Corporation and Martin Marietta Corporation ("Martin Marietta") merged in 1995 to form Lockheed Martin Corporation.  Lockheed Martin, and its wholly-owned subsidiaries, Lockheed Martin Energy Systems ("LMES") and Lockheed Martin Utility Services ("LMUS"), both Delaware corporations, assumed responsibility for Martin Marietta's contracts with the United States Department of Energy and the United States Enrichment Corporation to operate and manage gaseous diffusion plants owned by the United States.  At all times relevant to this Complaint, Lockheed Martin, or its predecessor corporation, Martin Marietta, owned Martin Marietta Energy Systems, Lockheed Martin Energy Systems, Martin Marietta Utility Services, and Lockheed Martin Utility Services.  From approximately 1990 through 1998, these entities were purchasers of nonconforming Hunt $UF_6$ valves for use in the federal facilities which they operated pursuant to government contract.

26.     Defendant MORPAC Industries, Inc. is a Washington corporation which buys Hunt valves and resells them to the United States Navy and/or a Navy contractor, Bath Iron Works, falsely certifying that such valves conform to contract requirements.

27.     The valves sold by Hunt to MORPAC serve as fuel valves on *Arleigh Burke* class AEGIS guided-missile destroyers, to include without limitation the following vessels:

U.S.S. *Shoup*, DDG 86
U.S.S. *Mason*, DDG 87
U.S.S. *Preble*, DDG 88
U.S.S. *Mustin*, DDG 89
U.S.S. *Pinckney*, DDG 91
U.S.S. *Chung-Hoon*, DDG 93
U.S.S. *Nitze*, DDG 94
U.S.S. *James E. Williams*, DDG 95

11

Unnamed, DDG 96
Unnamed, DDG 97
Unnamed, DDG 98

28.     On information and belief, based on the fact that Hunt supplied valves to

MORPAC for the above-listed DDG-51 destroyers, Hunt also supplied valves for other

DDG 51-class destroyers.

29.     Defendant All-Stainless, Inc., a Massachusetts corporation, acts as a

reseller of Hunt valves to Electric Boat, and knew or was recklessly indifferent to the

fact that the valves it was selling to the United States did not conform to drawing and/or

contract requirements.  All-Stainless also facilitates progress billing abuse by other

defendants.

30.     Defendant Lawrence Kelly was the Vice President of the Military Division

of Hunt.  In that position, Kelly had actual knowledge of, and direct corporate responsi-

bility for, Hunt's submission of false claims and Hunt's manufacture and delivery of

nonconforming valves to the United States and all Hunt military customers.  Kelly was

an officer of Defendant Hunt, and all his knowledge of Hunt's practices leading to False

Claims Act violations is attributable directly to Hunt.  Kelly was part of a "core group" of

Hunt senior managers, to include Wayne Aldrich, Bruce Bowman, Harold Gorby, Stuart

Sides, and Jeffrey Stewart, who were aware of the myriad False Claims Act violations in

which Hunt engaged in connection with the manufacture and delivery of nonconforming

valves and the submission of false claims to the United States.  Kelly is jointly and

severally liable for all damages caused by the sale of nonconforming valves, and for all

damages and penalties to which Hunt is subject for the making of false claims for

payment in connection with those valves.

12

31.     On or about April 6, 2005, defendant Kelly pleaded guilty to and stands convicted of a felony charge of Conspiracy to Defraud the United States before the United States District Court for the Northern District of Ohio.  The basis for Kelly's conviction was that he and co-conspirators, including *inter alia* Hunt Valve Quality Manager Wayne Aldrich,

> did unlawfully, willfully and knowingly combine, conspire, confederate and agree with one another to defraud the United States and obtain money by means of false or fraudulent representations, and provide the government with materially false writings or documents, to wit: Certificates of Compliance, knowing the same to contain materially false or fraudulent statements, and provide nonconforming valves intended for use by the United States Navy on nuclear powered submarines and surface vessels, and by the United States Department of Energy ("DOE") on containers that transport and store radioactive materials[.]

**A.     Relevant Non-Parties**

32.     Wayne Aldrich is the former Quality Control Manager for Hunt.  He has admitted to agents of the United States Department of Defense that while in that position, he falsified records pertaining to the conformance of Hunt valves destined for installation in Navy vessels and $UF_6$ applications.   Aldrich was part of a core group of Hunt senior managers, to include Bowman, Kelly, Gorby, Sides, and Stewart, who were aware of the myriad schemes to violate the False Claims Act in which Hunt engaged in connection with the manufacture and delivery of nonconforming valves and the sub-mission of false claims to the United States.  On July 15, 2004, Aldrich pled guilty to a felony charge of conspiring to defraud the United States during his employment at Hunt Valve by, *inter alia:*

> A.     Delivering and causing to be delivered for use by the United States Navy and the United States Department of Energy valves which failed to conform to the physical requirements of applicable blueprints and contract documents and were manufactured and repaired using unapproved and

13

improper techniques and procedures;

B.      Creating and causing creation of documents falsely representing that approved, proper techniques had been used to manfacture valves for use by the Navy and DOE;

C.      Delivering and causing delivery of valves for use by the Navy which did not meet requirements for traceability of component parts, and creating false documents which represented that such parts were traceable to their origins;

D.      Falsifying vendor certifications for materials received and used in valves;

E.      Falsifying nondestructive and visual examination test reports, falsely certifying that such tests were properly performed when in fact they were performed improperly or not at all; and

F.      Falsifying dye penetrant inspection certifications, falsely certifying that valve components intended for use by the Navy and DOE passed such inspections, without knowledge that the tests had been performed.

33.     Harold Gorby is the Vice President of Manufacturing for Hunt's Military Division. In that position, Gorby had actual knowledge of, and direct corporate responsibility for, Hunt's submission of false claims and Hunt's manufacture and delivery of nonconforming valves to the United States and all Hunt military customers. Gorby is an officer of Defendant Hunt, and all his knowledge of Hunt's violations of the False Claims Act is attributable directly to Hunt. Gorby is part of a "core group" of Hunt senior managers, to include Aldrich, Bowman, Kelly, Sides, and Stewart, who were aware of the myriad schemes to violate the False Claims Act in which Hunt engaged in connection with the manufacture and delivery of nonconforming valves and the submission of false claims to the United States.

34.     Carol Cox is a Hunt "Certification Administrator," referred to by defendant Kelly as a "core employee" of Hunt. Cox participated extensively in the schemes alleged in this Amended Complaint by willingly and routinely falsifying documents

14

submitted to the United States.  Cox was Hunt's authorized signer for Certificates of Compliance, all of which were and are false.

35.    Bruce Bowman is a long-time Hunt employee who for several years held the position of Quality Manager.  Certain of the illegal practices identified in this Amended Complaint became Hunt's *de facto* standard operating procedure under Bowman's direction, to include without limitation the practice of changing revision information on certifications to make it appear falsely that manufacturing occurred according to contractually-required specifications when it did not.

36.    Thomas Eakin is a nondestructive testing ("NDT") inspector at Hunt. Eakin routinely signed NDT reports falsely certifying that testing was done when it was not, or when he did not know that it had been; routinely performed nondestructive testing without following contractually-required procedures; and routinely permitted uncertified personnel to perform nondestructive testing after which Eakin would certify that the testing had been conducted by certified personnel.  Eakin has admitted this conduct under oath in the course of an arbitration hearing concerning his termination from Hunt Valve.

37.    Kenneth Meyer was hired by Hunt in early 2001 as a manufacturing engineer.  On or about 18 June 2001, Mr. Meyer stated to Ms. Gonter, in the course of his preparation of written Vendor Information Requests ("VIRs") to Electric Boat with respect to error cause and corrective action requirements, that he is "a good fiction writer" who "can make it up" when the information was not provided by Hunt.  When Ms. Gonter questioned Mr. Meyer further, she asked whether he was "just kind of making up" what he was reporting to Electric Boat.  He answered, "Yeah, right."  On or about 19

June 2001, Mr. Meyer advised Ms. Gonter that Wayne Aldrich had been writing VIRs to

Electric Boat "for years.  And he was doing the same thing I'm doing, just making it up."

On or about 8 August 2001, Mr. Meyer advised Ms. Gonter, in the course of his writing

a VIR to submit to Electric Boat, that "I need a lie that will fly."  Hunt made Mr. Meyer its

Director of Quality Assurance within days of Ms. Gonter's being fired in August 2001.

## IV.    FACTUAL ALLEGATIONS

### A.    The Current Status of Hunt Valves Delivered to the Navy

38.    Based upon the information brought forth by Relators, the Navy initiated

an investigation into the status of Hunt valves available to it for inspection.

39.    Although some 40,000 Hunt valves have been delivered to the Navy since

1993 either directly or through contractors, including without limitation defendant

Northrop Grumman Newport News Shipbuilding, defendant General Dynamics Electric

Boat, and Bath Iron Works, the vast majority of those valves still in existence are in-

stalled in Navy vessels which are in active military service.

40.    Replacement or meaningful inspection of thousands of installed Hunt

valves is, as a practical matter, impossible without taking Navy vessels, including

submarines and aircraft carriers, out of service and, in some cases, cutting into the

vessel's hull.

41.    The cost to the United States of performing a complete inspection of the

installed base of nonconforming Hunt valves would be massive and would have a

detrimental impact on the ability of the Navy to meet its readiness requirements in

connection with the national defense.

42.    In or about December 2002, the Navy concluded that all Hunt Valve

16

certification documents, including without limitation those which purported to constitute OQE under the Level 1/SUBSAFE program, could not be relied upon for any purpose. This finding was based upon a determination that the evidence amassed by the Relators, Department of Defense investigators, Navy investigators and engineers, and others demonstrated conclusively that Hunt personnel falsified so much paperwork that none of it could be considered true.

43.     Valves which are required to conform to Level 1/SUBSAFE requirements but are not accompanied by reliable documentation are, by definition, nonconforming to Level 1/SUBSAFE requirements.

44.     The Navy also undertook a technical review process to evaluate the installed base of Hunt valves, as well as those already installed in or in stock for installation in, among other vessels, the Seawolf-class submarine *U.S.S. Jimmy Carter*, which was commissioned on 19 February 2005; the *U.S.S. Virginia*, which was commissioned on 23 October 2004.

45.     The resulting technical review, which was conducted by the Navy in conjunction with technical resources sold to the Navy by the shipyard defendants, evaluated the physical attributes of 331 valves.

46.     The technical review documented 495 physical nonconformances on the 331 valves, which is an average of 1.5 physical nonconformances per valve. The Navy and the defendant shipbuilders determined that none of the identified nonconformances posed a danger to ship or sailor safety.

47.     Among the nonconformances identified during the technical review were visual defects on valves which had been certified as passing visual inspection,

17

undocumented weld repairs, improper and cracked tack welds, penetrant test indications, magnetic particle indications, dimensional nonconformances, hardness nonconformances, and wall thickness violations.

48.     In each of these cases, Hunt had certified that the valves conformed to all requirements and the valves had been accepted by the prime contractor.

49.     The Department of Defense has promulgated specific procedures by which to determine whether a sample size is sufficiently large to generate a statistically-significant test result.

50.     Because of the large number of Hunt valves which have been delivered and installed, it was impossible for the Navy to test a statistically-significant sample size of a number of valve types, to include without limitation a number of valve types characterized as "high-risk."

51.     Relators do not claim in this lawsuit that any presently-installed valves manufactured by Hunt pose a risk to any Navy vessel or any Navy sailor.  Relators do assert that for two reasons, it is impossible to state with certainty that all installed Hunt valves are safe.

52.     The first reason is the sample-size issue just identified.  Because the Navy did not have available to it sufficient valves to generate a statistically-significant sample with respect to many valve designs and configurations, it is not possible to extrapolate from the sample to the installed base.

53.     The second reason is that Hunt's manufacturing, inspection, welding, and other areas of incompetence and fraud were sufficiently random, extreme, and malicious that it is impossible to extrapolate from findings on one valve or group of

18

valves to other untested valves.

54.     The United States has sustained serious and effectively-irreparable harm as a result of the fraudulent conduct of the defendants. All Hunt valves, even were defendants able to show that they were physically conforming to all contractual requirements, are diminished in value by the complete absence of traceability and the complete absence of quality documentation for which the United States paid. Unless the defendants are able to demonstrate the residual value of the valves, that damage is valued under the False Claims Act at the amount paid by the United States for them. Such amounts are presently unknown to Relators.

55.     Based on the Navy's technical review, it is statistically likely that the majority of Hunt-manufactured valves sold to the United States also are physically nonconforming in a variety of ways, with an average of more than one defect per valve. Unless the defendants are able to demonstrate the residual value of the valves, that damage is valued under the False Claims Act at the amount paid by the United States for them. Such amounts are presently unknown to Relators.

56.     On information and belief, the cost to date of the government's investigative effort in connection with defendants' conduct relating to military valves is many millions of dollars.

**B.     The Navy Prime Contractor Defendants**

57.     This Second Amended Complaint names as defendants two categories of prime contractors, all of whom were customers of Hunt and all of whom purchased from Hunt, for delivery to the United States, nonconforming valves.

58.     Defendants General Dynamics Electric Boat, Northrop Grumman Newport

19

News Shipbuilding, and MORPAC all purchased valves for use in vessels of the United States Navy.

59.     Each contract between the United States and General Dynamics Electric Boat requires that the latter supply to the United States vessels, including all their components, which conform precisely and completely with all requirements of that contract.

60.     Each contract between the United States and Northup Grumman Newport News Shipbuilding requires that the latter supply to the United States vessels, including all their components, which conform precisely and completely with all requirements of that contract.

61.     Defendant MORPAC procured Hunt valves in its capacity as a subcontractor to Bath Iron Works in connection with fueling systems on AEGIS-class destroyers.  Each contract between Bath Iron Works and MORPAC requires that MORPAC supply systems, including all their components, which conform precisely and completely with all requirements of that contract.

62.     The duties referenced in the previous three paragraphs are nondelegable.  If a contractor chooses to hire subcontractors to perform any part of its contract with the United States, it nonetheless remains obligated to the United States (or, in the case of MORPAC, to Bath Iron Works, prime contractor on AEGIS-class destroyers) to provide an end item which conforms in all respects to the requirements of the contract.

63.     Each contract between the United States and a prime contractor requires that the contractor implement specific quality-control provisions.

64.     Each contract between the United States and a prime contractor requires

20

that the contractor "flow down" those quality requirements to subcontractors such as Hunt.

65.     The contracts between Electric Boat and Hunt require that Hunt perform in accordance with a Military Quality Assurance System known as MIL-Q-9858A and/or a Military Inspection System known as MIL-I-45208A.

66.     MIL-Q-9858A requires that every government contractor subject thereto ensure that "all supplies and services under the contract, whether manufactured or performed within the contractor's plant or any other source, shall be controlled at all points necessary to assure conformance to contractual requirements."

67.     The contracts between Electric Boat and Hunt require that all welding at Hunt be performed in accordance with Military Standards 248 and 278, as well as Hunt's own internal quality-control procedures.

68.     The contracts between Electric Boat and Hunt require that all non-destructive testing be performed in accordance with Military Standards 271 and 2035, as well as Hunt's own internal quality-control procedures.

69.     The contracts between Electric Boat and Hunt require that each and every report of non-destructive testing include recordation of the date of initial inspection and the identification of the person conducting the inspection.

70.     The contracts between NNS and Hunt require that Hunt  perform in accordance with a Military Quality Assurance System known as MIL-Q-9858A and/or a Military Inspection System known as MIL-I-45208A.

71.     The contracts between NNS and Hunt require that all welding at Hunt be performed in accordance with Military Standards 248 and 278, as well as Hunt's own

21

internal quality-control procedures.

72.     The contracts between NNS and Hunt require that all nondestructive testing be performed in accordance with Military Standards 271 and 2035, as well as Hunt's own internal quality-control procedures.

73.     The contracts between NNS and Hunt require that each and every report of non-destructive testing include recordation of the date of initial inspection and the identification of the person conducting the inspection.

74.     On information and belief, because the prime contracts for purchase of *Arleigh Burke* AEGIS guided missile destroyers require compliance with military quality and inspection systems and military standards governing inspection, welding, and testing, the contracts between MORPAC and Hunt require that Hunt perform in accordance with all applicable quality, inspection, welding, and testing standards.

75.     Each of these contractors failed to deliver to the United States valves manufactured by Hunt which conformed to contract requirements.

76.     Because each of these defendants knew or was recklessly indifferent to the fact that Hunt was delivering nonconforming material, each claim for payment submitted by each of them, which claim included systems, vessels, other items containing, incorporating, or consisting of valves manufactured by Hunt, constitutes a false claim in violation of 31 U.S.C. § 3729(a).

### 1.     General Dynamics Electric Boat's  Knowledge of Hunt Valve Company's Fraudulent Practices

77.     Relator has not yet had access to documents maintained by the Quality Assurance, Procurement, or contracting operations of General Dynamics Electric Boat regarding Hunt Valve (with the exception of a small compilation of documents selected

22

by counsel for presentation to Relators and the United States), and so cannot make detailed allegations regarding the contents of those files, which are known only to General Dynamics. However, both actual knowledge of and the reckless indifference of Electric Boat regarding Hunt's delivery of nonconforming material is established by, *inter alia*, the following circumstances.

78.     Electric Boat had a Quality Assurance Inspector, Harry Arnold, physically posted at Hunt's plant at least several days a week throughout most of the limitations period and assigned to perform source acceptance activities to ensure that Hunt delivered conforming product. During infrequent periods when Mr. Arnold was not co-located at the Hunt plant, one or more other Electric Boat quality representatives were generally present

79.     It was the job of Harry Arnold and other onsite inspectors to serve as the eyes and ears of General Dynamics Electric Boat at Hunt and to assure that Hunt delivered conforming material.

80.     Knowledge of General Dynamics Electric Boat onsite inspectors at Hunt Valve is attributable to General Dynamics for purposes of its liability under the False Claims Act.

81.     On or about 13 January 2001, Mr. Arnold advised Ms. Gonter that he had "lost all confidence" in Hunt and felt that he had been lied to by Hunt personnel.

82.     On or about 2 March 2001, Mr. Arnold learned that Hunt had failed to properly test a Level 1 valve which, when liquid-penetrant tested at Ms. Gonter's insistence, had extensive cracks in the valve body. Mr. Arnold advised Hunt personnel that althout he was rejecting the valve, he was not issuing any formal notice of improper

23

procedures to Hunt.  In connection with this failure to require root cause analysis and corrective action, Mr. Arnold advised that his boss, Electric Boat Quality Manager Robert Smelings, directed him to tell Hunt personnel to consider it an "Easter present." Arnold further stated that Hunt was "beyond [the] point" where a Corrective Action Request would solve the problem, and that "I don't think SCARs [Supplier Corrective Action Requests] are doing anything."

83.     In early 2001, relator Charles Gonter determined that Hunt had supplied Electric Boat with thousands of fasteners on Level 1/SUBSAFE valves which failed to conform to contract and drawing requirements because Hunt had failed to supply original mill certifications as required for Level 1/SUBSAFE components.  Electric Boat, through Mr. Arnold, directed Hunt not to formally report these thousands of non-conformances.  This violates Standard Clause A.2 of the contract between Hunt and Electric Boat.

84.     On or about March 17, 2001, Ms. Gonter asked Mr. Arnold why, when he rejected Hunt product, "your people don't back you up?"  Mr. Arnold replied by saying:

> Nothing I can do.  I can't go and raise a big stink and rage
> and holler and scream.  I have to live by it.  That's all.  What
> else can you do?  You don't have to like it, you just have to
> do it and accept it.  I told my boss, I don't have to like what
> you tell me to do, but I gotta do it.

85.     Mr. Arnold advised relator Tina Gonter on or about 20 March 2001 that he had encountered "nowhere near" the level of problems at any other supplier as at Hunt.

86.     Mr. Arnold advised Ms. Gonter on or about 20 March 2001 and in the context of discussing Hunt's quality problems that "I am not going to jail for" Hunt.

87.     Mr. Arnold advised Ms. Gonter on or about 22 March 2001 that valves

24

which had been finally inspected by Hunt were built, assembled, and inspected to the wrong print. "I mean, look how many people didn't follow procedures and policies."

88.     Mr. Arnold told Ms. Gonter on or about 22 March 2001 that Hunt personnel "write things up, and then nobody even pays attention to them," indicating that he informed Hunt's Quality Manager that "something's wrong with your system here."

89.     Mr. Arnold told Ms. Gonter on or about 22 March 2001 that he advised another Electric Boat employee, "you know, Joe, this is ridiculous. Give [Hunt] all this work because they're low bidder. And we gotta come back and inspect everything three times . . . It's costing us more in the long run."

90.     Mr. Arnold told Ms. Gonter on or about 22 March 2001 that "I don't know how you're ever gonna straighten this mess out, I just don't even know where to begin." When Ms. Gonter asked if he had any suggestions, Mr. Arnold replied "Yeah, stick of dynamite, blow this freaking place up."

91.     Mr. Arnold told Ms. Gonter on or about 22 March 2001 that "I get nervous, I get a funny feeling in my stomach every day, I don't see building any valve and then trying to make the paperwork match . . . Don't build it on a wish and a prayer, saying well, they'll buy it on a VIR, or we'll get corrected test reports, or we'll worry about it when we come to the point of assembling the package."

92.     On or about 27 March 2001, Mr. Arnold stated to Ms. Gonter, in critiquing Hunt's practice, that "I just don't see how you can build something and then go back and try to assemble all the paperwork, and expect it to be right."

93.     On or about 12 July 2001, Mr. Arnold advised Ms. Gonter that he had been ordered to accept valves for which Hunt did not have properly-traceable heat-treat

information.

94.     On or about 22 March 2001, Mr. Arnold stated that he had told GDEB employee Mark Sheehan regarding Hunt Quality Manager Wayne Aldrich, that "if his lips are moving he's lying."

95.     Mr. Arnold advised Ms. Gonter on or about 27 March 2001 that he had witnessed Hunt personnel beating on valves with hammers, and that when he questioned manufacturing supervisor Stuart Sides, who also witnessed the hammering, he was told that it "didn't hurt nothing."  Arnold, however, said that "[t]hose things are used on submarines and they're under a lot of pressure.  When them guys go down underneath the water they want to come back."

96.     On or about 27 March 2001, Mr. Arnold advised Ms. Gonter that he had brought in and showed to "everybody" at Hunt a videotape regarding the critical nature of Level 1/SUBSAFE hardware.

97.     On or about 27 March 2001, Arnold confirmed that he has not had confidence in Hunt's ability to produce conforming valves "[e]ver since I've been coming here."

98.     On or about 27 March 2001, Mr. Arnold stated to Ms. Gonter that Hunt personnel "wasn't reading the prints" and that "their contract review was shabby, at the least."

99.     Arnold then stated, referring to Hunt, that "[t]hey'd just shoot from the hip, and it just kept getting worse and worse and worse.  And then it was just so far out of control . . . Anything can come in.  They'd buy something five years ago and think it was good today without rechecking that."

26

100.    On or about 27 March 2001, Mr. Arnold stated to Ms. Gonter that "[o]ne of these days something major is going to get by Jim or I and hopefully it will be caught in the shipyard before it comes to a disaster and then the shit is going to hit the fan."

101.    On or about 27 July 2001, Mr. Arnold advised Ms. Gonter that he wanted to "get [the] attention" of defendant Lawrence Kelly "that his place is out of control" and that he therefore would *start* writing up and rejecting product which had quality concerns.

102.    On or about 27 July 2001, Mr. Arnold stated, regarding Hunt: "[L]ike my boss says, if they do it when you're there, what are they doing when you're not there?"

103.    Mr. Arnold advised Ms. Gonter on or about 11 April 2001 that Hunt had no effective policies or procedures.

104.    Mr. Arnold advised Ms. Gonter on or about 11 April 2001 that his supervisor, Robert Smelings, required him to accept nonconforming fasteners "for the convenience of the company."

105.    Mr. Arnold advised Ms. Gonter on or about 11 April 2001 that he believed that Hunt Quality Manager Wayne Aldrich was inappropriately involved in the manufacturing process, including the marking of material for traceability purposes, and that if he asked Mr. Aldrich why he was doing so, he would be told that "it's none of my business."

106.    On or about 12 July 2001, Mr. Arnold advised Ms. Gonter that he had "notebooks for 10 years" regarding quality issues, and that "[o]ne of these days the shit is going to hit the fan" with respect to Hunt.

107.    On or about 28 July 2001, Electric Boat source inspector John Leech

27

advised Ms. Gonter that Electric Boat purchasing agent Joe Connolly said, with respect to valves which Connolly wanted Hunt to ship, "I don't care if you reject it, we're sending them in anyways. We'll straighten it out at EB. Let them straighten it out. I need these valves."

108. In mid-2001, GDEB Shipbuilder Purchasing Agent Joe Connolly entered into an "informal agreement" with Hunt Valve Military Vice President Larry Kelly that, in Kelly's words to Connolly on or about 20 June 2001, "you would let us go ahead and fix stuff that we would normally find in our final review anyhow." Connolly stated that he was "looking for you guys" to provide source inspectors with incomplete certification packages, because "you got to get this thing under control. I'm getting hammered because I can't get material in here" from Hunt, and "I'm tired of going into Keily's office on Thursday and getting my—my rear end handed to me about the hardware in here."

109. On or about July 1, 2001, Mr. Arnold stated that his supervisor was prepared to accept valves with missing, required heat treat certifications. Arnold further stated that his supervisor "said in the future any material that you receive better have the correct information on it" and that "if they would put their foot down and stop this, then people up front would realize that they're not going to get away with that."

110. Despite extensive first-hand awareness that Hunt routinely engaged in fraudulent, shoddy and unethical practices which violated quality systems and contract requirements, General Dynamics Electric Boat continued to accept product from Hunt and did not effectively audit and require correction of Hunt's quality, calibration, inspection, welding, or nondestructive testing capabilities and operations, among others, choosing instead to allow Hunt to remain out of control and continue delivering

28

nonconforming valves year after year.

111.    Instead of taking steps to remedy the out-of-control systems at Hunt, Electric Boat consistently pressured Hunt, and Arnold, to ship valves in order to meet Electric Boat's shipbuilding schedules.

112.    General Dynamics's knowledge of Hunt Valve's fraudulent practices is reflected not only in the statements of Mr. Arnold, but in the contents of the certification packages which were accepted by Arnold and other GDEB source inspectors working at Hunt.

113.    MIL-Q-9858A and GDEB's contracts with the United States require that General Dynamics Electric Boat take all steps necessary to ensure that its sub-contractors, including without limitation Hunt Valve, have in place properly-functioning quality assurance and manufacturing operations.  Arnold's knowledge that Hunt personnel did not follow procedures and policies constitutes an admission on the part of General Dynamics Electric Boat that it failed properly to so ensure.

114.    Harry Arnold and other GDEB source inspectors purported to ensure that Hunt delivered conforming material were tasked to review the certification package (software) pertaining to each valve before the valve was shipped to the prime contractor.  The Purchase Order from the prime contractor to Hunt specified the documents required and the specifications to be followed.

115.    Since at least 1994, and likely since the mid-1980s, Harry Arnold utilized a Test Report Review protocol which required him to verify, among many other things, whether the date sequence of individual test reports in Certification Packages corres-pond chronologically and sequentially and whether any aspects of the test reports

29

appear to be out of order in any way.

116.    The certification packages provided by Hunt Valve to General Dynamics Electric Boat reveal many discrepancies between the requirements of the Purchase Order and the documents in the certification package that the source inspectors, if they had done their job properly, would have detected.

117.    Had General Dynamics Electric Boat detected the discrepancies identified in the following paragraphs and engaged in proper cause and corrective action analysis, Hunt Valve's fraudulent practices would have been apparent.

118.    Because General Dynamics had at its disposal ample facts to detect and rectify Hunt Valve's fraud, and was required by its purchase orders, quality system, and its contracts with the United States to use those tools properly, General Dynamics is directly responsible for the nonconforming Hunt valves delivered to the United States.

119.    By way of example, Electric Boat's purchase orders to Hunt require that, "as a minimum," nondestructive test reports provided by Hunt Valve show "the NDT method used, procedure identification, quantity inspected, acceptance standard used, date of initial inspection and inspector identification."

120.    A large number of Hunt Valve NDT reports do not satisfy this purchase order requirement.

121.    A large number of Hunt Valve NDT reports were falsified by Hunt personnel in easily-detectable ways which were overlooked by Arnold and other GDEB source inspectors.

122.    The following paragraphs contain representative examples of such failure of oversight by GDEB:

30

123.   **Certification Package 200551.**  Hunt Sales Order 200551 was reviewed by EB's source inspector Harry Arnold on 19 March 2001 and the valve was shipped on 21 March 2001.  The sales order was generated in connection with EB's purchase order PPL071-067.

124.   The certification package contains a hydrostatic test certification which shows that the valve, a 1/4" ball valve, was assembled on 4 January 2001 and underwent hydrostatic testing on 12 January 2001.  Also in the certification package is a test report giving the results of a nondestructive penetrant test of a weld repair of the seat face area.  It is dated 19 January 2001.  This is after the date that the valve was assembled and hydrostatically tested.  It is not possible to do a penetrant test of the seat area after the valve has been assembled.

125.   In the same certification package is a test report for a nondestructive visual test of the entire body casting, which is dated 23 January 2001, also after the valve was assembled.  It is not possible to do a visual test of the body casting of a valve after it has been assembled.

126.   Capable review of the certification package would have raised a red flag that at least some of these dates were false and the certifications did not satisfy the purchase order requirement of stating the dates of the nondestructive tests.

127.   In the same certification package, the Certificate of Compliance, which, among other things, certifies that the valve has satisfactorily completed all production testing, was signed and dated on 13 February 2001 by Hunt certification clerk Nancy Feezle.

128.   The certification package contains a certification for torque of the Plate

31

bleed position stop to bonnet, which is dated 23 February 2001. This date falls after the Certificate of Compliance was signed, stating that all production testing was satisfactorily completed. This was another red flag that a capable source inspector should have noticed.

129. GDEB's purchase order to Hunt mandates compliance to Electric Boat specification 2678G. This specification spells out the requirements for Level 1 material. Among those requirements is, with regard to traceability: "The supplier shall establish a material traceability system that provides positive identity of an item or material throughout the manufacturing process including heat treatment, storage and assembly operations[.] In all cases, the accompanying paperwork ...shall indicate the proper traceability code and shall provide accountability throughout the manufacturing process[.]"

130. EB specification 2678G further states that "Items where the traceability marking is lost shall be considered nonconforming material until appropriate tests have been performed that can absolutely identify the heat from which the item was produced[.] The method of re-establishing traceability shall be approved by Electric Boat Division for each incident where traceability is lost. This information shall be submitted on a Vendor Information Request. (VIR)."

131. **Certification Package 200551.** The certification package for Sales Order 200551 contains a test report for a nondestructive visual test of the ID plate welds. The test was certified as being performed on 13 February 2001. On 16 March 2001, more than a month later, the body heat code 77113 was added to the test report by Tom Eakin. This is the same date that General Dynamic Electric Boat's source inspector

32

Harry Arnold reviewed the certification package.  There is no objective quality evidence to show that this is the proper heat code and no VIR submitted to EB regarding this lapse in traceability.

132.    Hunt Sales Order package 980640 was in fulfillment of Electric Boat's purchase order PPJ188-040 for a Level 1 globe stop check valve.  The certification package was reviewed by Harry Arnold on 9 August 2000 and the valve was shipped to EB on 10 August 2000.

133.    There is no date annotated for the assembly of the valve, but an assembly test record states that the valve was hydrostatically tested on 30 June 1999.  A valve can undergo hydrostatic testing only after it has been assembled.  A certification for nondestructive penetrant test of the body cladding and hardfacing body seat is included in the certification package.  The test report is dated 3 July 1999, after the date of the hydrostatic test.  The test report was obviously false but the valves were accepted by Mr. Arnold.

134.    Also in Sales Order Certification Package 980640 is a certification for non-destructive penetrant testing of the body, bonnet, stem, disc and bonnet ring, dated 3 July 1999, after the valve was assembled and hydrostatically tested.  It is not possible to perform a penetrant test of the body after a valve has been assembled.

135.    **Certification Package 990813.**  Hunt's Sales Order package 990813 was in fulfillment of Electric Boat's purchase order PPK205-018 for a ½" ball valve, Level 1/SUBSAFE.  The certification package was reviewed by GDEB Source Inspector Mitchell Caley on 6 August 2001 and GDEB Source Inspector John Leach on 8 August 2001.  The valves were shipped to Electric Boat on 9 August 2001.

33

136.    The Sales Order Certification Package includes a certification for nondestructive visual test of the valve bonnet.  The test report is signed and dated by the tester Tom Eakin on 30 September 2000.  At the bottom of the test report, Wayne Aldrich's name is crossed out as QA manager and Walt Kruegel's name is printed. Walt Kruegel did not become employed at Hunt until the summer of 2001, approximately a year after the test was supposedly conducted.

137.    Harry Arnold was fully aware of when Aldrich left and Krugel started.

138.    Also in the Sales Order Certification Package is a certification for hardness testing.  This test report is dated 29 February 1999.

139.    February 1999 had 28 days.

140.    Though EB's source inspectors signed these test reports at the time of their review, these falsified reports were not noted and the valves were shipped to EB.

141.    **Certification Package 970677.**  The certification package for Hunt's Sales Order 970677 was prepared in fulfillment of EB's Purchase Order PPH176-055. The package contains the test reports for two Level 1 valves, 1" In-Line Stop Valves.

142.    The certification package was reviewed by GDEB's source inspector Tyler Perkins on 26 August 1998 and the valves were shipped to GDEB on 27 August 1998. The package contains a Certification of Compliance dated 24 April 1998, which is signed by Hunt's certification clerk, Nancy Feezle.  It certifies, among other things, that "All valves furnished on this contract have satisfactorily completed production testing."

143.    The next page in the package is a certificate for assembly and hydrostatic testing.  It purports to show that the valve successfully passed hydrostatic testing on 28 April 1998, four days after all production testing was supposedly completed.

34

144. The certification package contains a test report for a penetrant test of the disc, and represents that the test was performed to two different revisions of Hunt's dye penetrant procedure, Rev. J & Rev. K. A Vendor Procedure Approval Request (VPAR) for Revision J only is included in the package. This is in violation of EB's purchase order clause 60-67, which states that "a copy of the buyer's previously approved VPAR meeting all these conditions shall be furnished with shipment."

145. The above paragraphs represent sales order packages resulting from Electric Boat's purchase orders in 1998, 1999, and 2000. Many other certification packages which were reviewed and accepted by GDEB source inspectors contain test reports that were dated with impossible date sequences.

146. These include but are not limited to the following sales order packages:

| | | | |
|---|---|---|---|
| 980005 | 980078 | 980405 | 200162 |
| 980055 | 980079 | 980408 | 200164 |
| 980056 | 980081 | 980475 | 200168 |
| 980057 | 980082 | 980573 | 200170 |
| 980058 | 980083 | 980577 | 200172 |
| 980059 | 980089 | 980583 | 200177 |
| 980060 | 980091 | 980654 | 200179 |
| 980061 | 980092 | 980655 | 200180 |
| 980062 | 980093 | 980661 | 200181 |
| 980063 | 980094 | 980662 | 200183 |
| 980064 | 980130 | 980665 | 200184 |
| 980065 | 980131 | 980668 | 200185 |
| 980066 | 980171 | 980669 | 200186 |
| 980067 | 980226 | 980670 | 200201 |
| 980068 | 980227 | 980686 | 200254 |
| 980069 | 980228 | 980713 | 200274 |
| 980070 | 980230 | 990114 | 200346 |
| 980071 | 980274 | 990119 | 200353 |
| 980072 | 980365 | 990120 | 200398 |
| 980073 | 980382 | 990121 | 200572 |
| 980074 | 980389 | 990962 | 200551 |
| 980075 | 980391 | 200008 | 200677 |
| 980076 | 980392 | 200133 | 200678 |
| 980077 | 980404 | | |

147.   In none of these certification packages were valves rejected on account of these falsified test reports.

148.   In addition to the myriad certification-package issues identified in the foregoing paragraphs, defendant General Dynamics had actual knowledge of, or were recklessly indifferent to, fraudulent manufacturing and quality-assurance practices on the part of Hunt Valve and its personnel.

### 2.   Northrop Grumman Newport News Shipbuilding's Knowledge of Hunt Valve Company's Fraudulent Practices

149.   Relator has not yet had access to documents maintained by the Quality Assurance, Procurement, or contracting operations of Northrop Grumman Newport News Shipbuilding regarding Hunt Valve (with the exception of a small compilation of documents selected by defendant's counsel for presentation to Relators and the United States), and so cannot make detailed allegations regarding the contents of those files, which are known only to NNS.  However, both actual knowledge and reckless indifferent of NNS regarding Hunt's routine delivery of nonconforming material is established by, *inter alia*, the following circumstances.

150.   Newport News Shipbuilding sent an itinerant source inspector to Hunt on an irregular basis, and routinely accepted nonconforming product from Hunt.  These source inspectors did not take time to closely review Hunt's certification packages, but instead accepted numerous such packages in the course of a short visit to Hunt.

151.   As a result of NNS's failure to engage in meaningful review of Hunt's certification packages before the valves were shipped, it was routine practice between NGNNS and Hunt that NGNNS would orally or by telecopy contact Hunt personnel to obtain missing or "corrected" certifications.

36

152.    Examples of facially-deficient certification packages which were accepted by NGNNS personnel and followed by such contacts include, by way of example only, the following:

153.    **Certification Package 200053.**  Hunt's Sales Order certification package 200053 was in fulfillment of Newport News' purchase order 4500028919 for 1/4" in-line stop valves.  These valves were subject to Level 1/SUBSAFE requirements.  The certification package was reviewed at Hunt by Newport News source inspectors R. Collins and J. Pace on 16 March 2000.

154.    Included in the package is a test report showing that the valves were hydrostatically tested on 8 March 2000.  The valves must be fully assembled before hydrostatic testing can be performed.

155.    Also in the package is a certification for a penetrant test of the body seat and disc, dated 11 March 2000, which is after the valves were hydrostatically tested.

156.    It is not possible to perform a penetrant test of the body seat of the valve after it has been assembled.  The certification for penetrant testing of the body seat and disc is therefore false.

157.    There are no heat codes listed on this test report for the body seat.  The missing heat codes on the penetrant test report are in violation of EB standard clause 45-46, which is a requirement of NNS's Purchase Order to Hunt.

158.    NNS/EB standard clause 45-46 states that "[t]he major Level1 and/or subsafe part of each assembly shall be marked with a unique identifier traceable to both the lot of major Level 1 and/or subsafe parts and the lot of assemblies[.]  The test reports for the major Level 1 and/or subsafe piece parts of each assembly shall be

37

marked with the unique identifier to which they are applicable."

159.    In the same sales order package, there is a certification for a nondestructive visual test of the Yoke Bushing Weld Bead.  It is signed by the test operator, Tom Eakin.  There is no acceptance criteria checked, by which it can be ascertained how he accepted the results of the test.  This is in violation of the purchase order at NNS/EB standard clause 60-67, which requires that test reports for performance of NDT record, among other things, the acceptance standard used.

160.    The certification package includes a certification for nondestructive penetrant and magnetic particle tests of the stud nut, dated 12 May 1998 and signed by Wayne Aldrich.  The acceptance standard of NAVSHIPS 0900-LP-003-8000 was deleted by Aldrich and the acceptance standard of MIL-S-1222H was added on 6/99, more than one year after the test supposedly was conducted.

161.    This test report asserts that the penetrant test, NDT-1, was performed to MIL-STD-271 F, revision J.  There is no VPAR (vendor procedure approval request) in the package for revision J, but there is one for revision L, dated after the date of the penetrant test.

162.    This certification is in violation of NNS/EB standard clause 60-67, which requires that "the seller shall attach a copy of the buyer's VPAR that approved the procedure to the test report."

163.    Despite the foregoing discrepancies in Hunt certification package 200053, this certification package was approved by two NNS source inspectors.

164.    **Certification Package 990873.**  Hunt Sales Order 990873 was in fulfillment of NNS Purchase Order 4500027379, item 3, for Level 1 ½" globe stop

valves.

165.    The certification package for Sales Order 990873 was reviewed by Newport News source inspectors Gary Kuehnle and Russ Collins on 1 March 2000 and the valves were shipped on 6 March 2000.

166.    The certification package includes a telefaxed message sent to Hunt Certification Clerks Cox and Feezle from Gary Kuehnle on 4 November 2000, more than eight months after Kuehnle accepted as satisfactory the valve and certification package at Hunt.  The fax reads "A review of our files show that the cover sheet for item 003 was not signed.  Also, the hydro report for item 003 was not filled in or signed. I have sent a copy of the hydro sheet for item 002 as a reference, items 002 & 003 have the same part nos.  Please fill in and sign the copies for our files.  You can fax them back to the above [number].  Thanks, Gary."

167.    Attached to the fax cover was the hydrostatic testing certification with the missing items, the referenced hydrostatic testing certification from which NGNNS directed Hunt to to extract "reference" information, and the unsigned cover sheet (documentation index).

168.    On or about 15 November 2000, Hunt Certification Clerk Cox returned a fax noting the "Corrected/amended and signed certs."  The cover sheet was signed and backdated to 1/24/00.  All the missing information was filled in on the hydro certification report and the quality manager's signature was added and backdated to 13 December 1999.

169.    One of the items not missing on the original hydro certification report was the date of the hydrostatic test, which is reported as 20 January 2000.

39

170.    Hydrostatic testing can be performed only on a fully-assembled valve.

171.    Included in the package is a certification for a nondestructive penetrant test of the body seat and disc, dated 24 January 2000. This certification was false, as it is impossible that the penetrant testing occurred after hydrostatic testing.

172.    NGNNS's willingness to work with Hunt to "correct" false certifications was not limited to date issues. For example, Hunt Valve Sales Order Certification Package 200384 was submitted to NGNNS source inspectors in connection with Newport News Purchase Order 4500031534 for the purchase of ½" globe stop valves subject to the requirements of Level 1/SUBSAFE.

173.    The copy of the certification package maintained by Hunt includes a telefax from Hunt's Certification Clerk Carol Cox to Iris Walls of Newport News Shipbuilding dated 21 September 2000. The fax bears the notation "Corrected Trinity Cert." A note is attached to the fax cover which reads "Iris Walls, 9-19-00, 4500031534, line 10, 200384, Body DKWA, ASTM A105' 98, 22% min elong. Trinity 21%."

174.    There are two Trinity Forge test reports in the certification package. The first is dated 23 February 2000 and one dated 24 February 2000. Both test reports purport to certify the chemical analysis, physical analysis, hardness test results and heat treat test results for .5" 900 SWE bodies, quantity 194. The test dated 24 February has a fax header showing it was faxed from Trinity Forge on 20 September 2000—the day after Ms. Walls's request, and the day before Ms. Cox's fax.

175.    The invoice number, purchase order number, part number, heat number, code and chemical analysis attributes are the same on each certification. However, the

40

the physical analysis attributes are almost entirely changed, including the elongation, from 21% on the first certification to 26% on the second certification.

176.    Newport News Shipbuilding's purchase orders require that a copy of test reports showing all chemical and mechanical properties required by the applicable specification is to accompany each shipment of tested parts.  The purchase order also requires that the "seller shall furnish a certification that the test reports represent the actual attributes of the items furnished on the purchase order and that the test results are in full compliance with all applicable specification and order requirements."

177.    Newport News directed and allowed Hunt to fax an amended certification with no objective quality evidence that the amended attributes were the correct ones and with no indication on the revised certification that it was revised.

178.    There is no indication that NNS ever issued any notice of discrepancy to Hunt Valve or required any cause analysis or corrective action in connection with these two variant certifications, at least one of which is necessarily false.

179.    Variations on the issues described in the foregoing paragaphs are found in at least the following Hunt Valve certification packages accepted by NGNNS personnel:

| | | | |
|---|---|---|---|
| 960186 | 970654 | 980513 | 990148 |
| 960188 | 970735 | 980539 | 990150 |
| 970086 | 970736 | 990016 | 990151 |
| 970119 | 970737 | 990094 | 990152 |
| 970120 | 970869 | 990095 | 990306 |
| 970121 | 980036 | 990096 | 990309 |
| 970147 | 980049 | 990097 | 990311 |
| 970149 | 980177 | 990098 | 990387 |
| 970337 | 980217 | 990099 | 990388 |
| 970409 | 980260 | 990100 | 990389 |
| 970539 | 980309 | 990101 | 990390 |
| 970540 | 980310 | 990147 | 990451 |

| | | | |
|---|---|---|---|
| 990458 | 990949 | 200085 | 200465 |
| 990459 | 990950 | 200093 | 200467 |
| 990465 | 990951 | 200094 | 200471 |
| 990473 | 990952 | 200096 | 200472 |
| 990478 | 990953 | 200097 | 200473 |
| 990479 | 990954 | 200100 | 200475 |
| 990671 | 990955 | 200101 | 200476 |
| 990684 | 990956 | 200102 | 200485 |
| 990686 | 990957 | 200105 | 200486 |
| 990740 | 990958 | 200114 | 200488 |
| 990741 | 990967 | 200115 | 200492 |
| 990742 | 990969 | 200119 | 200505 |
| 990744 | 990970 | 200121 | 200520 |
| 990745 | 990972 | 200124 | 200525 |
| 990757 | 990973 | 200325 | 200526 |
| 990759 | 990974 | 200369 | 200527 |
| 990760 | 990975 | 200371 | 200528 |
| 990790 | 990976 | 200374 | 200529 |
| 990791 | 990977 | 200376 | 200530 |
| 990792 | 990979 | 200377 | 200538 |
| 990793 | 990980 | 200380 | 200539 |
| 990858 | 990982 | 200381 | 200545 |
| 990872 | 990983 | 200384 | 200559 |
| 990873 | 990984 | 200390 | 200563 |
| 990874 | 990986 | 200425 | 200564 |
| 990875 | 990988 | 200437 | 200596 |
| 990876 | 991020 | 200439 | 200627 |
| 990877 | 991021 | 200441 | 200628 |
| 990878 | 991022 | 200455 | 200633 |
| 990879 | 991023 | 200456 | 200661 |
| 990880 | 991024 | 200457 | 200685 |
| 990881 | 991025 | 200458 | 200686 |
| 990884 | 991026 | 200459 | 200687 |
| 990892 | 991028 | 200461 | 200690 |
| 990892 | 200035 | 200462 | |
| 990893 | 200037 | 200463 | |
| 990894 | 200053 | 200464 | |
| 990895 | 200057 | | |

180.   On information and belief, based on the absence of any indication in Hunt Valve's records of such, none of the foregoing certification packages was rejected by NGNNS quality, procurement, or inspection personnel.

181.   Despite the fact that hundreds of certification packages were delivered by

Hunt Valve to Northrop Grumman Newport News Shipbuilding with improper and impossible paperwork, NGNNS also failed to meaningfully audit or require corrective action on the part of Hunt.

182.    When NGNNS did purport to audit Hunt Valve, its audit report falsely reported that Hunt was complying with all purchase order and quality assurance requirements.

183.    By way of example, a Newport News Senior Analyst and Senior Inspector both spent five days onsite at Hunt in June 1999 conducting source inspections and a survey of Hunt's quality systems.  The week-long effort by NNS personnel resulted in the conclusion that Hunt's production capabilities and quality system were in compliance with MIL-I-45208A and MIL-Q-9858A.

184.    Comparison of this Newport News audit report with the certification packages reviewed by the Senior Analyst and Senior Inspector, with welding certification documents readily available in Hunt's files, and with other audits reveals a comprehensive failure on the part of Newport News in detecting myriad fraudulent practices, false statements and documents, and nonconformances to contract, purchase order, and quality requirements.

185.    The NGNNS auditors state that they performed source inspection on NNS purchase orders P656D-0-N2138 and P657D-0-N815.  These equate to Hunt sales orders 990310 and 990106, respectively.  Both are Level 1/SUBSAFE product.

186.    Comparison of these two Sales Order Certification Packages with the NGNNS Senior Analyst and Senior Inspector's Audit Report reveals at least the following discrepancies.

43

187.   The auditors answered "yes" to the question, "Is NDT performed at the appropriate step in the manufacturing process?"  But in sales order 990310, the test report for assembly and inspection does not annotate any date for the assembly of the valve or for the hydrostatic test.  It is dated 4 June 1999 for inspection buy-off, which can occur only after the valve is fully assembled and hydrostatically tested.

188.   The test reports for nondestructive penetrant tests of the stem, stud, and nut in the sales order package are dated 7 June 1999, which was after the date of the final assembly inspection.  These pieces are used in the assembly of the valve and cannot be tested after the valve is assembled.

189.   The test report for a nondestructive penetrant test of the body seat is dated 4 June 1999 the same date as the inspection buy-off, but since it is not known when the valve was assembled or hydrostatically tested, there is no Objective Quality Evidence that the body seat penetrant test was performed in the appropriate sequence.

190.   In sales order 990106, the test report for assembly and inspection is dated June 3, 1999 for inspection buy-off, but again the test report does not annotate any date for assembly of the valve or for the hydrostatic test.  Thus, there is no objective quality evidence that the penetrant tests of the body seat, stem, and stud, which are all dated 2 June 1999 were performed at the appropriate step.

191.   The auditors checked "satisfactory" to the question, "Sampling data recorded on inspection records."  But in Sales Order 990106, the nondestructive test report for the stud, heat code BUW, lists a lot quantity of 485.  All other test reports for the stud BUW in the sales order package list a lot quantity of 385.

192.   In the same Sales Order, Hunt's nondestructive test report for body stud

44

nut, heat code ZEJ, lists a lot quantity of 100, but the hardness certificate (Hunt's own test report), lists a lot quantity of 107 for the body stud nut ZEJ.

193.    In response to a series of questions regarding whether Hunt's permanent records identify various attributes, the auditors answered "yes" to all questions.  But again, a review of the two sales order packages which they reviewed tells a different story.

194.    In connection with the attribute "Material tested," which the auditors certified as acceptable, on Sales Order 990106, the nondestructive test report for a penetrant test of the stem lists the heat code as JDV-UT, while all other test reports/certifications for the stem list the heat code as JVD-UT.

195.    In connection with the attribute "The date of the test," several test dates are (as identified above) missing, and other dates are in a sequence which is impossible.

196.    In connection with the attribute "NDT operator," in both Sales Order packages, the nondestructive test reports for penetrant test of the body seat only identify the person who "certified" the test—not the operator who performed it.

197.    This nonconformance also violates the specific requirements of NGNNS's purchase orders to Hunt Valve, which require that all reports of nondestructive testing include the date of the original test and the name of the person performing the test.

198.    Hunt Valve used NDT forms in connection with countless nondestructive tests on NGNNS product which include the designation "tested/certified," thereby making it impossible to determine who performed NDT and when it was performed. Each such form violates NGNNS's purchase orders to Hunt.

45

199. Additionally, in Sales Order Certification Package 990106, the test report for penetrant test of the stud states "Tested/certified by" Jim Wolosyn and has his inspection stamp, but also has Tom Eakin's name checked, so it is impossible to know who actually performed the test.

200. In Sales Order Certification Package 990310, the test reports for penetrant tests of the stem, the stud, and the nut all state "Tested/certified by" Jim Wolosyn and contain his inspection stamp, but both his and Tom Eakin's names are checked as "inspectors," so it is impossible to know who actually performed the tests.

201. Another question on the audit asks if the NDT operators work to written instructions that conform to contract requirements. It is checkmarked "yes." But the test reports for stud and nut in sales order package 990310 and the test reports for stem and body stud nut in sales order package 990106 all are missing sales or work order numbers and only reflect that the pieces are from "stock." The work orders/sales order numbers would give the work instructions to the test operators, so it cannot be determined what written instructions the operators were working to, nor if those instructions conformed to contract requirements.

202. Another question that the auditors checkmarked "yes" asks if the supplier maintains traceability throughout the entire manufacturing process. The certification packages demonstrate that this statement was false.

203. The nondestructive test reports for penetrant tests of the body seat in both packages state no heat number or lot number (either of which would provide traceability from the beginning of the manufacturing process). The test reports do bear a sticky label which has the *valve* assembly serial number printed on it (composed of the pur-

chase order number, item number, and valve number). This does not provide trace-ability to the valve body seat, because the same number is on the test reports for all of the other pieces used in the assembly of the valve. In fact, all of the other non-destructive test reports do contain a heat code number as required, in addition to the valve serial number.

204. Included as part of Newport News' audit was a two-page checklist regarding Hunt's welding processes. The audit certified that all of Hunt's welding operations, operators, materials, and certifications were proper.

205. Records maintained at Hunt demonstrate that these representations by NGNNS's auditors were false.

206. Hunt's primary welders during the relevant time frame were Scot Jenkins and Dennis Falzetta. Hunt Valve's qualification records for these welders show a complete disregard for quality procedures.

207. By way of example, welder qualification vendor evaluation reports for welder Jenkins for four weld procedures (WP-2, WP-7, WP-8 and WP-10) are identical (dates, signature, test performed, and other attributes), with only the weld procedure number and alloy being changed. Visual comparison of the reports demonstrates that they were fabricated by a cut-and-paste method.

208. There are three different versions of the welder procedure qualification WP-24, rev. A in Jenkins' file, all dated the same date but with different welding instructions.

209. On the vendor's evaluation sheet for welding qualification WP-278-43-1, Hunt's quality manager, Wayne Aldrich, crossed out Dennis Falzetta's typed name and

the technique number and hand-wrote Scot Jenkins' name and a different technique number, dating the changes one day before the evaluation was faxed from the testing vendor.

210. On qualification tests WP-5 and WP-6 for Jenkins, the original dates of 10-23-85 on both Welding Procedure Qualification Data sheets have been whited out and redated 10-13-85, so that the dates of the welding procedures precede the date of the testing facility's evaluations.

211. Dates for several weld qualification tests for Falzetta and Jenkins are impossible, with the dates of the welding and penetrant tests at Hunt Valve in Ohio preceding or being identical to the dates of the evaluations, which were conducted by a testing facility in Utah.

212. The testing vendor's evaluation sheet for welder qualification test report for Falzetta for WP-278-1-1 has handwritten changes made to it which alter the test number and type of test. There is no indication who made the changes or when they were made.

213. The testing vendor's evaluation sheet for welding qualification WP-30 for Falzetta annotates two different welding procedures, WP-30 in one place and WP-29 rev. B in another place.

214. The Newport News auditors also stated that Hunt's welding inspection records were fully conforming.

215. Had the auditors examined Hunt's handwritten Daily Welding Job Record, an inspection record to which Hunt would have had to grant access had the auditors asked, extensive discontinuities would have been apparent.

48

216.   The daily welding record for the six-month period prior to the June 1999 audit, shows at least the following nonconformances: missing quantities welded; missing rod (filler metal) trace codes; use of discontinued rod trace codes; missing weld procedures; incorrect weld procedure revisions, including weld procedure revision annotation prior to the revision being written; and missing rework/repair tag identification.

217.   Comparison of the Newport News Shipbuilding June 1999 audit with several Hunt internal audits conducted close to the same time demonstrates that the shipbuilder auditors failed to detect serious nonconformances which even Hunt's own auditor found.

218.   For example, in April 1999, Hunt Quality Assurance Specialist James Wolosyn found, in regard to Hunt's internal audit system, that though there was a system of documented audits, follow-up procedures were not being carried out and that management did not insure that audit discrepancies were corrected in a timely manner. He also found that off-shift and weekend activities were not scheduled for separate audits as required by EB.  There was no documentation of any corrective action taken in regard to Wolosyn's internal audit, no completion date and no verification of closure to this audit finding.

219.   By comparison, the Newport News audit, conducted two months later, found that Hunt's "Use of internal audits to evaluate system effectiveness" was satisfactory and in compliance with MIL-Q-9858A, §3.1.

220.   Wolosyn conducted two audits of Hunt's calibration and dimensional control area in January 1999 and June 1999, the latter just two days before the

49

Newport News audit. Wolosyn's findings included the following: inadequate control of gauges and test equipment, instruments indiscriminately piled on the counter; tool crib frequently unlocked and unattended on second and third shifts; infrequent, inadequate and undocumented spotchecks by supervisors of the accuracy of measurements and insurance of calibration; calibrated equipment recall program inadequate; equipment being pigeon holed at work stations and due dates being exceeded by months; out-of-calibration equipment found in use during routine checks. There was no corrective action plan noted in the audit findings, no completion date and no close-out verification.

221.   The Newport News audit resulted in one observation regarding calibration: a record for a torque wrench had only three set readings when four were required. All other findings in regard to calibration and measuring and test equipment were marked satisfactory, including, but not limited to, the following: method of identifying calibration status, adequate system for the mandatory recall of standards and test equipment within time limits or interval frequencies, and all measuring and test equipment handled in a manner that does not adversely affect the calibration or condition of the equipment.

222.   The June 1999 audit by Newport News found that Hunt's procedures regarding final inspection were satisfactory, including at least the following: use of written inspection/test instructions covering final inspection and verification of accomplishment of required inspections/tests.

223.   Wolosyn's audit of the Final Inspection area in November 1999 found that there were no instructions for non-dimensional inspection and that inspection was overly dependent on the memory of the inspector.

224.   Regarding Contract Review, the audit by Newport News found satisfactory

50

that a complete review of the contract was conducted and that the necessary controls, processes, test equipment, skills, etc. were identified; that preparation of work instructions and periodic review was satisfactory; and that identification and action on special or unusual contract requirements were satisfactory.

225.   Wolosyn, in two audits conducted in April 1999, found that **no contract review procedures** existed at Hunt and that the practice in place was totally reliant on experience and memory.

226.   Similarly, in March 2001, General Dynamics Inspector Harry Arnold referred to Hunt's Contract Review as "shabby, at the least."

227.   The Northrop Grumman Newport News Shipbuilding audit in June 1999 grossly misrepresented the true state of affairs at Hunt Valve.

228.   In addition to the myriad certification-package issues identified in the foregoing paragraphs, defendant Newport News Shipbuilding had actual knowledge of, or were recklessly indifferent to, fraudulent manufacturing and quality-assurance practices on the part of Hunt Valve and its personnel.

229.   Because Newport News Shipbuilding had at its disposal ample facts to detect and rectify Hunt Valve's fraud, and was required by its purchase orders, quality system, and its contracts with the United States to use those tools properly, Newport News Shipbuilding is directly responsible for the nonconforming Hunt valves delivered to the United States.

230.   Additional failure by both NGNNS and GDEB to engage in a level of oversight consistent with the requirements of MIL-Q-9858A, MIL-I-45208, and their contracts with the United States is demonstrated by audits which they jointly performed

51

at Hunt Valve after learning of the investigation precipitated by the allegations of the Relators in this case.

231.    In an audit performed by the United States Navy in or about September 2003, the audit team identified "six findings, sixty-five nonconformances, and fifteen observations . . . in the areas of Nondestructive Testing, Welding, Purchasing, Nonconforming Material Control/Corrective Action, Quality System Implementation, and Self Assessment."

232.    The audit findings of the Navy team, which took place a full year after Hunt learned of the investigation into its practices, confirmed that Hunt personnel continued to be unable to properly weld and inspect valves, control material, and control or correct their own processes.

### 3.    MORPAC Industries' Knowledge of Hunt Valve Company's Fraudulent Practices

233.    MORPAC Industries also had no source acceptance personnel on site at Hunt.  Rather, it required Hunt to submit Certificates of Compliance and Certificates of Testing and Inspection as part of Hunt's shipments to MORPAC.

234.    Documents submitted by Hunt to MORPAC were sufficient to place MORPAC on notice that Hunt was not properly conducting nondestructive testing on valves delivered to MORPAC.  Hunt consistently certified to MORPAC that much or all of the nondestructive testing on valves took place within a day of shipment of the valves to MORPAC.  MORPAC knew, or should have known, that this was impossible.

235.    The valves shipped to MORPAC were accompanied by NDT reports all of which noticeably were signature-stamped, with no effective certification of NDT performance or results.

236.  MORPAC conducted no audits to ensure or require that Hunt complied with contract, drawing, and Military Standard requirements.

237.  Each of the Navy prime-contractor defendants knew or was recklessly indifferent to the terrible state of quality, inspection, testing, and welding at Hunt.

### C.  Defendants Lockheed Martin (LM), Lockheed Martin Energy Systems (LMES), and Lockheed Martin Utility Services (LMUS)

### 1.  Lockheed Martin's Operation and Management of Gaseous Infusion Plants for the United States Department of Energy.

238.  Lockheed Martin and its predecessor-in-interest Martin Marietta Energy Systems (MMES) were the primary operating contractors to the United States Department of Energy with respect to the gaseous infusion plants in Paducah, Kentucky and Portsmouth, Ohio from approximately 1984 through 1998.

239.  In approximately 1984, Martin Marietta contracted with the United States Department of Energy (DOE), under U.S. Government Contract Nos. DE-AC05-840R21400 and DE-AC05-76OR001, providing for, *inter alia*, the operation and management by Martin Marietta of the Oak Ridge National Laboratory in Oak Ridge, Tennessee; the operation and management by Martin Marietta of the uranium enrichment plant at Paducah, Kentucky; and the operation and management by Martin Marietta of the uranium enrichment plant at Portsmouth, Ohio.

240.  Martin Marietta Energy Systems ("MMES"), was a wholly-owned subsidiary of defendant Martin Marietta, which managed and operated the Paducah and Portsmouth facilities from April 1, 1984 through June 19,1995.  By agreement with DOE, Martin Marietta guaranteed MMES's performance of its contracts with DOE

241.  MMES subcontracted with Hunt on or about October 1990 to

53

manufacture, assemble, inspect, and test $UF_6$ valves. This was designated Subcontract No. 84P-AXK05V.  The subcontract documents specify that the $UF_6$ valve procurement from Hunt was "certified for national defense use[.]"

242.    The enactment by Congress of the Energy Policy Act of 1992, called for the creation of a government-owned corporation, the United States Enrichment Corporation ("USEC"), to lease from DOE and operate the uranium enrichment facilities at Paducah and Portsmouth. USEC did in fact lease those facilities from DOE pursuant to a Lease Agreement effective July 1, 1993. DOE continued as owner of the facilities, continued to operate those buildings and grounds at the PGDP not leased to USEC, continued to be responsible for environmental restoration, site custodial, wastes management, and other related services and continued to be responsible for environmental compliance as to "legacy wastes," i.e., those generated prior to July 1, 1993, including legacy wastes stored inside buildings leased to USEC, with Energy Systems as its contractor for carrying out those responsibilities.

243.    MMUS was created as a wholly-owned subsidiary of Martin Marietta to operate the uranium enrichment facilities that USEC had leased from DOE. MMUS operated those facilities pursuant to government contracts with USEC.

244.    From July 1, 1993 until June 19, 1995, a portion of defendant MMES's responsibilities for managing and operating the facilities was shifted to defendant Martin Marietta Utility Services ("MMUS"), another wholly-owned subsidiary of Martin Marietta. MMES retained responsibilities under its contracts with DOE to perform various environmental restoration, site custodial, waste management, and other related services at the PGDP.  Upon information and belief, on or after July 1, 1993, MMUS

54

was responsible for the procurement of the $UF_6$ valves from Hunt.

245.    Defendant Lockheed Martin Corporation ("LM") merged with Martin Marietta Corporation in 1995 to form defendant Lockheed Martin Corporation and wholly owned subsidiaries Lockheed Martin Energy Systems (LMES) and Lockheed Martin Utility Services (LMUS). At all times relevant to this Complaint, Lockheed Martin, or its predecessor corporation, Martin Marietta, owned MMES, MMUS, defendant LMES and defendant LMUS.

246.    Effective June 19, 1995, upon the merger of LM and MM, Defendant LMES assumed the contracts of MMES with DOE and defendant LMUS assumed the contracts of MMUS with USEC. From June 19,1995 until April 1, 1998, LMES and LMUS succeeded to MMES and MMUS's respective responsibilities under those contracts.

247.    On or about July 27, 1998, USEC, Inc. was formed as the result of an initial public offering by the United States of stock. LMUS continued to operate under contract with USEC until May 1, 1999, at which time the LMUS contract ended, and USEC began operating the facilities itself.

248.    On or about 1998, Bechtel Jacobs replaced LMES as DOE's primary operating contractor.

### 2.    Lockheed Martin's Knowing Failure to Comply With Contractual Requirements.

249.    On information and belief, Defendants LMES and LMUS and their predecessors in interest (collectively referred to as LMES/LMUS), during various periods as described above, were required by their contract with the United States to ensure that all $UF_6$ valves delivered to the United States conformed in all particulars

55

with the requirements set out in the contract documents, including without limitation ANSI Standard N14.1 and ASME NQA-1, Quality Assurance Program Requirements for Nuclear Facilities.

250.   LMES/LMUS contracted with Hunt to manufacture, assemble, test, inspect, and certify as conforming $UF_6$ valves from Hunt during approximately the period from 1990 through 1998.

251.   LMES/LMUS' contracts with Hunt flowed down DOE's contractual requirements, including among other requirements, to maintain a quality program in accordance with the quality requirements of NQA-1, 1989, to comply with the nuclear safety requirements of 10 CFR Part 21, and to manufacture, assemble, test, inspect, and certify the valves as conforming to drawing and specification requirements.

252.    Examples of such requirements include LMUS Purchase Order Nos. 49365, 496508, 496771, 499720, 514106, 524465, 534806, 535367, and 542802.

253.    Notwithstanding these requirements, the valves were not manufactured, assembled, tested, inspected, and certified in conformance with drawing and specification requirements.  Hunt did not maintain a quality program in accordance with the quality requirements of NQA-1, 1989 nor did it to comply with the nuclear safety requirements of 10 CFR Part 21.

254.   LMES/LMUS procured these valves for use at DOE facilities when it knowingly failed to assure compliance with its contractual requirements.

255.   LMES/LMUS failed to conduct auditing and compliance activities sufficient to ensure that Hunt fully implemented the quality requirements set out in ANSI N14.1 and NQA-1 and safety requirements set out in 10 CFR Part 21.

256. Because of LMES/LMUS' failure, Hunt valve was able to continue manufacturing $UF_6$ valves for use in containment vessels at DOE facilities without properly conforming to quality assurance or nuclear safety requirements.

257. In 2001, Relators became confidential sources for the United States with respect to Hunt Valve's failure to comply with required military and nuclear safety requirements. Relators provided information to the United States regarding the failures of Hunt and the prime contractors, including information regarding violations of the quality assurance and nuclear safety requirements applicable to the manufacture, testing, and assembly of $UF_6$ valves.

258. As a result of these reports, the Nuclear Regulatory Commission (NRC) audited Hunt Valve in or about 2001 and concluded in or about August 2001 that Hunt did not have a compliant NQA-1 quality assurance system. Prior to this time, LMES/LMUS had not properly performed any similar audits and had not informed the United States that Hunt did not have a compliant NQA-1 quality assurance system.

259. On October 25, 2001, the NRC issued Inspection Report 99902011-2001-201 on October 25, 2001 identifying significant deficiencies with Hunt's compliance with quality assurance requirements. Prior to this time, LMES/LMUS had not properly performed any similar inspections and had not informed the United States that there were significant deficiencies with Hunt's NQA-1 quality assurance system.

260. On October 31, 2002, the NRC issued an Information Notice entitled "Potentially Defective $UF_6$ Cylinder Valves (1-inch)" which discussed the safety concerns related to the $UF_6$ cylinder valves manufactured by Hunt, including (1) cracked packing nuts; and (2) loss of material traceability and failure to conduct

57

hardness testing, for a series of heat codes, for valves stems purchased by USEC.

261.    On March 24, 2003, the NRC issued Supplement 1 to the Information Notice discussing additional safety concerns, including the fact that several 1-inch $UF_6$ Hunt valves have failed the pressurized seat leakage acceptance criteria of the ANSI N14.1 Standard, "Uranium Hexaflouride-Packaging for Transport" during a testing program conducted by USEC.

262.    On August 29, 2003, the NRC issued a Bulletin, No. 2003-03, entitled "Potentially Defective 1-Inch valves for Uranium Hexaflouride Cylinders" to advise of the performance and safety concerns of $UF_6$ cylinder valves manufactured by Hunt Valve Company.  The Bulletin required specific action and written response by (1) NRC licensees and certificate holders authorized to possess and use source material and/or special nuclear material for heating, emptying, and filling of $UF_6$ in 30- and 48-inch cylinders; and (2) registered users of certificates of compliance for enriched $UF_6$ packages under 10 CFR Part 71.

263.    Specifically, the NRC Bulletin required all such addressees to (1) identify all Hunt valves under their control; (2) ensure that cylinders with Hunt valves already installed are safely used and transported during a transition period not to exceed 12 months; (3) ensure that only valves verified to be compliant with NRC regulations, NRC licenses and certificates, and DOT regulations are in use by the end of the transition period by either replacing all Hunt valves with equivalent compliant valves or independently demonstrating that the Hunt valves installed are compliant; and (4) provide written documentation of how the addressee plans to demonstrate compliance with the Bulletin within the transition period.

58

264. The Bulletin also referred to prior Information Notices regarding the valves, including Information Notices 2002-31 (March 24, 2003 and October 31, 2002) regarding potentially defective $UF_6$ Cylinder Valves, Information Notice 97-24 (May 8, 1997) regarding failure of packing nuts on $UF_6$ valves, and Information Notice 89-78 (November 22, 1989) regarding failure of packing nuts on $UF_6$ valves.

265. At no time prior to the NRC's inspection in August 2001 did Hunt have a compliant NQA-1 or ANSI N14.1 quality assurance system.

266. At no time prior to August 2001 did LMES/LMUS properly notify the United States of Hunt's systematic failure to maintain compliance with required quality assurance requirements and nuclear safety systems.

267. As a result, LMES/LMUS knowling submitted flase claims for payment by the United States with respect to all $UF_6$ valves it procured and supplied for use at DOE facilities.

### 3. Defendant All Stainless, Inc. as a Sham Distributor of Hunt Valves

268. Hunt valves also are sold to Hunt customers, including at least Electric Boat and Newport News Shipbuilding, by defendant All Stainless, Inc.

269. The sham relationship between All-Stainless and Hunt was a conspiracy orchestrated by and participated in by defendant General Dynamics Electric Boat so that it could falsely represent to the United States Navy that it was making progress in connection with its use of small, disadvantaged businesses as subcontractors.

270. General Dynamics Electric Boat, All-Stainless, and Hunt entered into an illegal contract pursuant to which All-Stainless posed as a distributor of Hunt Valves, and Hunt paid All-Stainless illegal commissions for falsely posing as a Hunt distributor.

59

271.    This relationship violated the Anti-Kickback Act, 41 U.S.C. § 52, which makes it illegal to provide any money to a prime contractor or subcontractor for the purpose of improperly obtaining favorable treatment in connection with a government contract.

272.    Northrop Grumman Newport News Shipbuilding had actual knowledge of and at a minimum acquiesced in this illegal relationship.  Many invoices and other documents sent by Hunt to NGNNS were altered to falsely reflect that the valves were being sold to NGNNS by All-Stainless, Inc.  NGNNS therefore is a co-conspirator with Hunt, GDEB, and All-Stainless in connection with the All-Stainless conspiracy.

273.    Because All Stainless assumed Hunt's contractual obligations with respect to the delivery of conforming valves, All Stainless was responsible for the de-livery of conforming valves to the United States and its contractors.

274.    All Stainless's Military Sales Manager was Hunt Military Sales Manager Jeffrey C. Stewart.

275.    Jeffrey C. Stewart routinely signed sales documents representing sales of Hunt valves by All Stainless to Electric Boat and Newport News Shipbuilding.  Each such sales document was a false document because it impliedly represented that the terms and conditions of Hunt's contracts with Electric Boat and NNS had been complied with.

276.    Because Stewart was All-Stainless's Military Sales Manager with respect to Hunt valves and signed All-Stainless's claims for payment pertaining thereto, his knowledge was directly attributable to defendant All-Stainless.

277.    Because Stewart had full knowledge of the quality and manufacturing

60

problems at Hunt, his knowledge is attributable to All-Stainless and all claims regarding valves which All-Stainless sold to Electric Boat, NNS, and any other Hunt customer, because all such valves fail to conform to contract requirements.

278.   All claims made by All-Stainless for valves sold to Electric Boat, NNS, and any other Hunt customer are false claims, because all such valves fail to conform to contract requirements.

279.   All claims made by All-Stainless for valves sold to Electric Boat, NNS, and any other Hunt customer also are false because they were the result of Requests for Quotations made in furtherance of the conspiracy in which Hunt's and All-Stainless's Military Sales Manager Jeffrey Stewart expressly and falsely certified that the bids did not include payment of commissions when, in fact, Hunt paid All-Stainless an illegal commission.  This commission started at approximately 3% and then was renegotiated by defendant Kelly to approximately 1%, and cost the United States several hundred thousand dollars because Hunt inflated its bids to compensate for the kickbacks it paid to All-Stainless.

280.   Hunt, sometimes on its own and sometimes through defendant All-Stainless, Inc., requested and received "customary progress payments" for the manu-facture and assembly of valves prior to their shipment.  Hunt personnel sometimes refer to these practices as "billing in place."

281.   The intended purpose of customary progress billing is to permit a con-tractor to recover from the government a portion of the contract price for long-lead-time items being manufactured under contract to the United States.

282.   Hunt routinely failed to deliver products until after it had billed and

61

received payment for the entire value of the contract, in violation of contract requirements applicable to customary progress billing.

283.  On or about 29 June 2001, Jeffrey Stewart advised Ms. Gonter that Hunt past practice was for "Hal [Gorby] to decide at the end of the month, and they would just bill stuff off."

284.  In the same conversation, defendant Kelly advised Ms. Gonter that Hunt tried to rely on whether certification packages were complete as a progress-billing trigger, but "realized that our confidence level in the cert packages was so bad that that wasn't a good criteria."

285.  On or about 31 July 2001, Electric Boat Source Inspector Harry Arnold advised Ms. Gonter that Electric Boat required Hunt to ship valves with open quality questions "[p]robably for the same reason you guys do, probably for . . . progress billing."

286.  Hunt routinely manipulated its records to show that valves were complete, or had reached applicable production milestones, when they were in fact incomplete and in some instances had not been started, all in order to manipulate the progress billing system so that claims for payment could be submitted to Hunt's customers when Hunt was not entitled by law or contract to make such claims because it had not reached the claimed milestone.

287.  On or about 23 March 2001, defendant Kelly advised Ms. Gonter that Hunt billed in December 2000 for parts which were not inspected or shipped until January 2001.  In connection with the certification process for those valves, Kelly referred to Hunt's and Electric Boat's certification process as "waiving everything and

62

just signing shit" and referenced Hunt's "failure to communicate" engineering requests and testing requirements. Kelly agreed with Ms. Gonter that the reason the certification package was signed under those conditions was "[b]ecause we were trying to get it out of here, because it was the end of the year and we were progress billing."

288. Hunt, for a period of time known only to its personnel, "progress billed" Electric Boat for 100% of the sales price of valves intended for installation in Navy vessels.

289. All claims for customary progress payments which represent that Hunt is entitled to a customary progress payment on the basis of a false representation of milestone achievement are false claims.

290. Each valve shipped by Hunt to a prime government contractor is accompanied by a Certificate of Compliance pursuant to which Hunt certifies compliance to all contract requirements, including without limitation drawing requirements and quality-system requirements.

291. All such Certificates within the limitations period are false documents used to get false claims paid, because no valve shipped by Hunt within the limitations period has conformed in all respects with the requirements of contract and drawing.

292. Hunt also sells valves to the United States pursuant to "direct-buy" contracts.

293. Every valve sold by Hunt to the United States on a direct-buy contract is accompanied by a form DD-250 pursuant to which Hunt certifies compliance to all contract requirements, including without limitation drawing requirements, welding requirements, and quality-system requirements.

63

294.    Every DD-250 delivered to the United States by Hunt within the limitations period is a false document used to get a false claim paid.

### 4.    The Nonexistence of Hunt's Quality-Assurance System

295.    Defendants Electric Boat, NNS, MORPAC, and LMES are required by their contracts with the United States to ensure that all parts delivered to the United States are manufactured, assembled, tested, and inspected in a manufacturing environment governed by what is called a "quality system."

296.    These prime-contractor defendants are required by their contractual obligations to the United States to "flow down" these quality requirements to their sub-contractors, including as relevant here Hunt and All-Stainless.

297.    Hunt is required to, and represents that it does, maintain conformance to two government quality standards, MIL-Q-9858A and MIL-I-45208A.  This representation is found, *inter alia*, on Hunt's World Wide Web site:  http://www.huntvalve.com/military/military.htm.

298.    The cost of a defense contractor's quality system is factored into the cost to the United States of weapons systems and their components, and a properly-functioning quality system is part of the consideration a contractor provides the United States in exchange for contract payments.

299.    Hunt not only was required to maintain fully-functioning quality systems, but was paid taxpayer dollars to do so.

300.    At all material times, Hunt did not have an effective quality system. Rather, under the aegis of, and with the full knowledge and participation of, its senior managers, Hunt has for many years used its quality apparatus to create the superficial

64

appearance of a functioning quality system while in fact taking actions with the purpose and intent of hiding the absence thereof in order to expedite the shipment of material and receipt of funds.

301.    Hunt's Vice President for Military Sales and Quality Manager have both pleaded guilty to federal felony charges admitting that they conspired to submit false claims based on the bogus quality and manufacturing practices at Hunt.

302.    Numerous Hunt quality personnel were themselves routinely involved in, for example, the fabrication and falsification of material certifications, manufacturing certifications, vendor certifications, welding certifications, and inspection certifications. Hunt thus used its purported quality system as an artifice to cover up defects in materials, vendor compliance, manufacture, assembly, inspection, testing, and certification.

303.    On January 31, 2001, defendant Kelly's assistant, Jan Schaefer, advised Ms. Gonter that she overheard Quality Manager Aldrich tell defendant Kelly "I'm not doing that anymore—there are too many questions being ask[ed], so if I'm going to do it I'm going to do it right."

304.    Hunt routinely omitted first article testing which was required by contract and/or Hunt's own quality procedures.  On or about 9 March 2001, Hunt engineer Dale Carrick informed Ms. Gonter that specification requirements for first article tests had been "[j]ust totally, blatantly ignored[.]"

305.    An important element of the quality system applicable to Hunt's manu-facture of components for Navy vessels is "traceability."  Traceability means that there is a paper trail for every part which permits the manufacturer, the prime contractor, and

65

the United States to accurately and conclusively verify that materials conform to requirements, that outsource vendors are properly qualified and do proper work, that required processes were performed in proper sequence, that all operations were performed by qualified and properly-certified personnel, and that required testing and inspections were performed in proper sequence.

306. Hunt systematically and routinely falsified documents in order to falsely create the appearance of traceability when in fact traceability did not exist.

307. Hunt routinely failed to translate drawing requirements imposed by its customers into shop routers which included required inspections, tests, and procedures. As a result, there was no way to ascertain that shop personnel understood the steps to be performed in the manufacture and assembly of the valves, and no way for Hunt's quality personnel to ensure that all activities required by the drawings had been performed.

308. As a result of the complete breakdown and corruption of the Hunt quality system, all valves shipped by Hunt since that breakdown and corruption occurred—at the latest, sometime in the late 1980s—are nonconforming to contract requirements and of questionable physical integrity.

309. Many valves shipped by Hunt, including but not limited to all "525" valves with Monel bodies, are physically nonconforming because improper welding techniques were used.

310. Hunt has from time to time knowingly shipped valves with nonconforming components. On or about 22 March 2001, Hunt engineer Dale Carrick told Ms. Gonter that Hunt had for years knowingly shipped "306" valves which had steel fasteners rather

66

than the titanium fasteners required by drawing.

311.    Carrick informed Ms. Gonter that the problem surfaced because the Navy experienced shipboard failures relating to corroded fasteners, and that Hunt never acknowledged that it knew a product substitution in violation of contract requirements had occurred.

312.    All Certificates of Compliance executed by Hunt personnel during that time period are false because, among other reasons which vary from Certificate to Certificate, they falsely certified the existence of a conforming quality system.

313.    On or about March 9, 2001, Ms. Gonter was informed by Quality Control Manager Wayne Aldrich that if she did not ask him questions about missing quality-assurance certifications, he would "not have to lie" to her about those certifications.

314.    In or about April 2001, Mr. Aldrich advised Ms. Gonter that he was "committing fraud" in connection with the computer scanning and manipulation of certification documents pertaining to valves being delivered to Electric Boat.

315.    Mr. Aldrich performed this self-described "fraud" by changing numbers on scanned certification documents pertaining to Prime Test Heat Treating so that those documents  would appear to certify matters which they do not.

316.    Mr. Aldrich admitted to Ms. Gonter that he had scanned and manipulated documents on at least several occasions, and also admitted to Ms. Gonter on or about 9 April 2001 that he was able to "manipulate" signatures "electronically" by "pasting" them from one scanned certification to another.

317.    It was common practice at Hunt to use a computerized document scanner to change revision letters on assembly, testing, or certification documents in order to

67

create the false appearance that a valve was manufactured or assembled to the required iteration of a drawing and/or specification when it was in fact manufactured or assembled to an earlier, nonconforming iteration.

318.   These documents with manipulated information are potentially unidentifiable by virtue of the means which was used to falsify the document.  Therefore, the fact that Aldrich and others have admitted that this practice took place affects the integrity of all Hunt quality-assurance documents.

319.   The use by Hunt Quality Assurance personnel of computers to scan in documents and change their contents so corrupts the historical record which Hunt is by contract required to maintain as to constitute spoliation of evidence.

320.   On or about April 9, 2001, Mr. Aldrich advised Ms. Gonter that he was "getting better at forgery" in connection with his practice of changing certification documents so that they appeared to certify matters which they did not.

321.   On or about April 9, 2001, Mr. Aldrich advised Ms. Gonter of a "really nasty" method he used to facilitate forgery of quality documents.

322.   The "really nasty" method was the use of multiple Hunt facsimile machines, faxing the document from one to the other so "it becomes a little fuzzy" and "[y]ou now look like you have a brand new original . . . It works really well."

323.   Hunt quality engineer Jim Wolosyn also admitted that he had scanned and changed information on certification documents in order to make them appear that they certified matters which they did not.

324.   On or about 10 April 2001, Ms. Gonter witnesses Quality Director Aldrich painting the anvils on a micrometer, which is a precision measuring device, with clear

fingernail polish because a part to be measured was undersized and Aldrich wished to make it appear larger than it was.  Aldrich advised that "clear fingernail polish dries and it still looks like a shiny metal surface."

325.   The next day, 11 April 2001, Aldrich advised Ms. Gonter that he presented the doctored micrometer to Electric Boat Source Inspector Harry Arnold, and watched him repeatedly attempt to obtain a proper measurement.  In commenting on Mr. Arnold's inability to figure out that Aldrich had doctored the calipers, Aldrich characterized Arnold as "whiney, whiney, whiney, whiney, whiney."

326.   On or about March 29, 2001, Hunt Military Division Vice President, defendant Lawrence Kelly, admitted to Ms. Gonter that Hunt has "generated a lot of cert[ification] packages that have altered certs, which is basically fraudulent."

327.   Kelly further admitted to Ms. Gonter that "[T]here's no way of ever retrieving those freakin' things either.  Not without sending a huge, huge fireball out."

328.   Hunt regularly permitted materials buyer Tina Lanney and others to void Internal Rejection Reports regarding the absence of traceability and generate false documentation creating the false appearance of traceability.  These *ad hoc* procedures violate fundamental principles of quality assurance, as well as Hunt Internal Quality Procedure QC-6, which requires Material Review Board signoff on all IRRs.

329.   Hunt routinely permitted quality personnel to disposition Internal Rejection Reports without engineering analysis, and routinely disposition IRRs without any root cause analysis and/or corrective action.  These *ad hoc* procedures violate fundamental principles of quality assurance, as well as Hunt Internal Quality Procedure QC-6, which requires Material Review Board signoff on all IRRs.

69

330. Hunt's quality system was chronically out of control in the area of calibration. On or about 30 March 2001, certification manager Paul Mayhew informed Ms. Gonter that tools used by machine operators on the floor were not calibrated, and that he had stopped trying to calibrate them "a couple years" before because "I was starting to get backed up in here so much that I couldn't keep up."

331. Mayhew also advised that "when an operator needs to check their gauges, they just bring them in themselves and check 'em. Some of them do. Some of them don't." When Ms. Gonter asked Mr. Mayhew how Hunt knew that machinists are accurately verifying dimensions, he responded: "We don't." Additionally, Mr. Mayhew reported that he did not even know what tools were being used: "I have no idea what they're using . . . what personal tools they're using, I don't know."

332. Mayhew also advised that the tool room was not being operated "legally" because tools were missing for weeks at a time when they were supposed to be reported missing after one day, and that it is impossible to determine what parts were measured with what tools.

333. Certain tools are required to be calibrated prior to every use. Mr. Mayhew advised Ms. Gonter that this does not occur.

334. Mr. Aldrich had plenary authority over Hunt's quality control operations until Ms. Gonter was hired by Hunt in November 2000, and retained essentially-complete control thereof until his resignation from Hunt in or about June 2001.

335. This breakdown and corruption of Hunt's quality system has occurred since or before 1987 and continued until at least late 2001. Shortly after Ms. Gonter began working at Hunt in late 2000, she was advised by Wayne Aldrich that there was

70

"shaky and underhanded stuff" at the company.

336.   On or about 26 March 2001, Ms. Gonter was advised by Hunt welder Dennis Falzetta that he would not believe or trust anybody at Hunt.

### 5.   Falsification of performance-testing certifications

337.   After valves were assembled and purportedly ready to ship, Hunt routinely falsified material and/or inspection certifications which were required to be part of the final inspection package but were found to be missing.

338.   Certification Administrators Nancy Feezle and Carol Cox were issued standing instructions by Aldrich to prepare false certifications for required inspection and/or testing which was not performed during manufacture or assembly.

339.   Cox informed Relator that the Certification Administrators have followed such procedures since approximately 1987.

340.   These false certifications were falsely dated to conform with the date the testing might be expected to have occurred during the manufacturing process, so that it falsely appeared as though the testing occurred at the proper time.

341.   These false certifications bear either (1) the signature of the test inspector or Wayne Aldrich at the time the final package is being prepared; (2) the forged signature of a test inspector; or (3) the signature stamp of Wayne Aldrich, which was supplied to the Certification Administrators to facilitate this scheme.

342.   The certification package for Electric Boat part No. 218037252, Purchase Order ("P.O.") No. PPL175-083 is a typical example of Hunt's practice of appending the final certification package after the fact.  The original certification package was completed by Certification Administrator Nancy Feezle on 9 January 2001.  On 18 January

71

2001, a new certification package was created to add three nondestructive testing reports and one welding report, none of which existed at the time the valve was purported to be complete and ready for source inspection.

343. These reports were created and back-dated to falsely complete the certification package, and to cover up the fact that weld repairs were performed on the parts and not documented.

344. Hunt routinely completed the certification packages prior to the date of final inspection, when such result would be impossible without falsifying certifications, including, without limitation, for Sales Order Nos. 200188-190, 200198, 200460, 990205-204, 990216, 990220, 990282, 990285, 990292, 990295, 990506, 990574, 990579, and 990712.

345. Certification packages for Sales Order Nos. 990292 and 990712 were completed despite notations that certain tests had not been performed or that a Vendor Information Request ("VIR") had not yet been answered by the prime contractor.

346. VIRs are created for nonconforming parts and seek permission from the prime contractor to ship parts with the nonconformance. Hunt routinely certified and shipped parts with unanswered VIRs, including parts no. 4558738-C-MODI and 4558738-D-MODI, Sales Order Nos. 990232, items 38-43; 200184, items 37 and 58; 200186, item 39; 200399, item 4; 200701, item 2; 200175; item 28; and 200176, item 29.

347. Hunt routinely initiated engineering reviews and VIRs after valves had been assembled and/or shipped.

348. Hunt engineer Dale Carrick informed Ms. Gonter on or about 9 March

72

2001 that Hunt had designed and had manufactured and sold to the "fleet" for eight to ten years, a family of relief valves with sizes from one-quarter to six inches which actuate at 20% of the required relief capacity, despite Hunt's certification that the valves operated according to specification requirements. Mr. Carrick advised that "[t]he original design didn't meet the MIL-SPEC" but that "we've stated and had stated for years that our valves meet MIL-SPEC."

349. Hunt also sold this defective design to the United States. Mr. Carrick advised Ms. Gonter that the defect was caused by an improperly-designed spring. On or about 22 March 2001, Mr. Carrick advised Ms. Gonter with respect to these valves that "I don't think it'll hurt or kill or damage much if it does fail . . . I go through my mind that way and justify it."

### 6. Nonconformances pertaining to nondestructive testing.

350. Nondestructive testing ("NDT") methods are the primary means of validating the conformance of components to contract specifications and drawing requirements, and are a critical and integral part of the quality systems which are required by contract to be in full force and effect at Hunt.

351. NDT methods which are required to be utilized by Hunt include liquid-penetrant inspection, magnetic particle inspection, ultrasonic inspection, and visual inspection.

352. Liquid penetrant ("LP") inspections, also called "dye penetrant" inspections, are used to ensure that parts are not cracked or otherwise infected with surface discontinuities. Dye penetrant testing involves using dye and a developer to show discontinuities in the surface of metal parts.

73

353.    Many of the valves produced by Hunt include a number of welds, and many of these welds are, in the finished and assembled product, either covered over by second welds or concealed by other components of the valve.

354.    Dye penetrant inspection of these in-process welds is a critical process in the consistent production of conforming welded parts, because it assures that only welds which conform to MIL-STD-271 move to the next production step.

355.    Early in her tenure at Hunt, Ms. Gonter concluded that it would be physically impossible for Hunt NDT personnel to perform the number of dye penetrant examinations which were certified as having been performed on various dates. Wayne Aldrich told her that a shortened, five-minute dwell time was used for one-third of the dye penetrant examinations which were conducted at Hunt in lieu of the required dwell time of 20 minutes.

356.    Quartering the dwell time on dye penetrant inspections substantially reduces the likelihood that the test will show any existing nonconformance. This is so because the dye must be given time to infuse the nonconformance through capillary action.

357.    The following deficiencies in Hunt's dye penetrant practices and procedures were observed by Relators:

358.    Penetrant procedure NDT-1, which utilizes water-washable dye, was routinely substituted for required penetrant procedure NDT-3, which utilizes dye which must be removed with solvent and so is harder and more time-consuming. When this occurred, Hunt personnel, to include at least Wayne Aldrich and Thomas Eakin, nonetheless certified that NDT-3 dye penetrant examination had been performed.

74

359.    Hunt dye penetrant inspectors routinely used inappropriate dwell times and drying times; inappropriately used forced air to dry the developer; and in general used wholly inappropriate techniques which individually or in sequence raised a substantial risk that defects and nonconformances would not be detected.

360.    Magnetic particle inspections ("MPI") are another means by which cracks are detected.  MPI is performed by subjecting a part to an electromagnetic field and drenching it with a fluorescing fluid which, when examined under black light, shows surface and subsurface nonconformances.

361.    On numerous occasions, magnetic particle inspections have been omitted and certifications were falsely generated and back-dated.

362.    Visual inspections, with or without magnification and with or without close-tolerance measuring devices, are required to ensure that parts conform to drawing requirements at various stages during manufacture and/or assembly.  Visual inspections under 5x magnification were routinely omitted, and certifications were falsely completed for visual inspections long after they should have been performed.  These certifications were back-dated to create the false appearance of conformance.

363.    First Article Inspections of a valve from every lot manufactured and assembled by Hunt are required to be performed by Hunt's quality procedures.  These inspections were infrequently performed, and many of those which were performed were performed with uncalibrated tools owned by Hunt employees.

364.    Hunt routinely omitted nondestructive testing required to be performed by applicable drawings and specifications, and then falsely certified that the testing was performed with satisfactory results.

75

365. NDT inspector Tom Eakin was instructed to, and did, complete and sign certifications for visual inspections and dye-penetrant inspections he did not do.

366. Liquid penetrant inspections were routinely certified as performed in accordance with drawings, specifications, and procedures, when they were not performed at all.

367. Ultrasonic testing ("UT") is a nondestructive testing method which is used at Hunt to determine whether walls of valve bodies meet thickness requirements.

368. Ultrasonic testing was performed at Hunt by Wayne Aldrich, who was not certified to perform such tests.

369. Hunt had no personnel who were qualified to perform UT, and had no approved procedure for its performance.

370. Aldrich utilized an uncalibrated UT machine which gave erratic readings.

371. On or about 22 March 2001, Ms. Gonter observed Aldrich purport to calibrate the UT machine using coffee as a coupling medium. This practice is highly improper and defeats the purpose of calibrating the machine.

372. Aldrich's use of coffee as a couplant was confirmed orally to Ms. Gonter by James Wolosyn on or about 23 March 2001.

373. Magnetic particle inspections were routinely certified as performed in accordance with drawings, specifications, and procedures, when they are not performed at all.

374. Hunt routinely permitted its personnel to vibro-etch parts with identifiers purporting to show that non-destructive testing had been performed when it had not. By way of example only, Ms. Gonter caught janitor Neil Van New Kirk vibro-etching stems

76

to indicate that they had been visually inspected.  He admitted to her that no such testing had been performed.

### 7.  Nonconformance in the Reporting of Nondestructive Testing

375.  Hunt is required by its contracts, by MIL-Q9858A and MIL-I-45208A, by MIL-STD-271, by MIL-STD-2035, and by the requirement that it provide Certificates of Compliance, to properly conduct and certify all nondestructive testing.

376.  GDEB and NGNNS are required by their contracts with the United States to conduct inspection sufficient to ensure that all material they procure from subcontractors conform to all technical requirements, and bear a nondelegable burden to ensure that its vendors, to include Hunt, maintain complete and reliable records of all testing activities.

377.  Each and every Hunt NDT report is made on a form which states that all personnel were properly qualified and that all NDT procedures satisfy the requirements of all applicable Military Standards.

378.  Hunt's reporting of nondestructive testing was uniformly nonconforming in at least the following ways.

379.  Dozens of NDT reports have been signed by Thomas Eakin certifying that he performed NDT inspections on dates when he was on vacation or otherwise not at work.

380.  Hundreds of NDT reports have been signed by Thomas Eakin and Wayne Aldrich falsely representing that NDT examinations were performed by them when they were in fact either not performed or performed by unqualified and uncertified personnel, to include janitors, machinists, and welders.

77

381.   Hundreds of NDT reports have been printed out from computer programs and signed after the fact, with no contemporaneous record to support the contention that testing was actually performed.

382.   Hunt Certification Administrators Feezle and Cox routinely printed out computer-generated certifications and stamped them with Wayne Aldrich's signature while having no knowledge that the testing was actually performed.

383.   Hunt Certification Administrators Cox and Feezle routinely printed out computer-generated certifications which were then signed by either Aldrich or Eakin with no idea whether the testing was actually performed.

384.   Hundreds of reports show up in certification packages which are not reflected on Hunt's NDT log, an ostensibly-contemporaneous record.

385.   Certification Administrators Cox and Feezle routinely added false entries to the NDT log at the same time that they produced computer-generated false NDT reports.

386.   Hundreds of NDT reports were signed by Aldrich and Eakin months or years after any alleged NDT could possibly have been done, and without regard to whether the testing was actually performed, so that NDT certifications could be included in documentation packages sent to customers.  These NDT certifications were all false documents.

387.   Hundreds or thousands of reports misrepresent the type of NDT which was actually performed.

388.   Dozens or hundreds of reports lack traceability to the parts allegedly tested.

78

389. Hunt personnel routinely added traceability information to parts or paperwork in order to falsely create the appearance that they matched when it could not be verified that the documents and parts corresponded to each other.

390. Hunt personnel routinely added acceptance criteria to reports after the fact.

391. In connection with each of these falsifications, there is no way to determine whether NDT was performed; what tests, if any, were performed; when, if ever, those tests were performed; who, if anyone, performed the tests; whether the tests were performed properly; what acceptance criteria, if any, were used; whether the reports were filled out in a timely manner; or whether the person signing the report has any knowledge of actually performing the procedures.

392. As a consequence, Hunt's reporting of NDT results is systemically non-conforming and inadequate to reasonably prove that any individual item of NDT was in fact performed

### 8. Testing Performed in Violation of Specification

393. Torque, hydrostatic, and hardness tests are required by drawing to be performed on the valves Hunt manufactures and/or assembles for Electric Boat and NNS.

394. Hunt routinely did not perform these tests in accordance with drawings and specifications.

395. Torque testing was performed utilizing torques above the required ranges. Ms. Gonter has been informed the testing was performed at torques outside the range required by drawing so that valves would pass hydrostatic testing, and that if the valves

79

were not torqued at ranges out of specification, the valves would fail hydrostatic testing. The higher torque range was not recorded: Instead, Hunt falsely certified torque testing was completed in accordance with the lower ranges specified in required drawings and specifications.

396. Hunt lacked the physical ability to calibrate its torque wrenches equipment to the range required by many specifications to which its personnel purportedly torqued.

397. Though certifications were completed for hydrostatic testing which appeared to be in conformance with required drawings and specifications, that testing was, in connection with at least certain valves, performed in accordance with an incorrect procedure maintained in the part jacket.

398. The results of Brinell hardness tests were not recorded in accordance with drawing requirements. The machine used to record results of Brinell hardness tests was not properly calibrated to evaluate appropriate hardness ranges. Hardness values which were out of the required range were recorded as if the values were within range.

399. Hunt permitted its maintenance personnel to attempt to repair its hardness testing equipment despite requirements that such machines be professionally calibrated, thereby voiding any calibration.

400. Visual testing was routinely performed after assembly of the valve, at which time it was impossible to complete the internal visual test required by applicable drawings, specifications, and procedures.

401. In addition to creating falsified certifications, Hunt modified original certifications to mask testing performed in violation of drawing requirements. Hunt personnel, acting on orders from Hunt management, created a certification with falsified

80

test values which were pasted on top of the incorrect values on the original certification. Upon photocopying the cut-and-pasted certification document, the corrected values appear to have been recorded at the date of the original signature when the recorded values were nonconforming.

402.   Examples of falsified certifications generated using this "cut-and-paste" technique include Sales Order No. 200783, P.O. No. PPL100-023, Part No. 11-NS-0200, Certificate for Assembly and Hydrostatic Testing, tested November 18, 2000 and inspected December 28, 2000; and Sales Order No. 200691, P.O. No. PPL099-084, Part No. 211037689, Certificate for Assembly and Hydrostatic Testing tested November 28, 2000 and inspected December 10, 2000.

403.   This practice of testing in violation of drawings, specifications, and pro-cedures has occurred since at least 1987 and continued until at least late 2001.

404.   Electric Boat and NNS accepted and sold Hunt valves to the United States certified for conformance to government contract requirements despite actual knowledge, deliberate ignorance, and/or reckless disregard of the false practices described above.

### 9.    Welding Performed in Violation of Military Specifications

405.   Hunt does extensive welding in the course of purporting to perform its contractual obligations.

406.   The performance and inspection of all Hunt's "Military Division" welding is governed by at least the following four Military Standards in addition to the overall Quality standards applicable to all operations.  The first is MIL-STD-278, Welding and Casting Standard.  The second is MIL-STD-248, Welding and Brazing Procedure and

81

Performance Qualification.  The third is MIL-STD-271,  Nondestructive Testing Requir-ements of Metals.  The fourth is MIL-STD-2035, Nondestructive Testing Acceptance Procedure.

407.   These Military Standards, when properly implemented together with a properly-functioning quality system, constitute a comprehensive environment to ensure that personnel who perform welding operations are properly trained, qualified, and certified by their employer; that welding is done precisely as required by contract; and that welds are inspected carefully and comprehensively to ensure their integrity.

408.   Hunt did not perform welding operations in conformance with these standards.  Rather, its habit was to require welders to do whatever was necessary to expedite the production of parts, without regard to whether it was consistent with drawing requirements or the Military Standards.

### a.      Certain Violations of MIL-STD-248

409.   Specific, systemic violations of MIL-STD-248, which governs the training, qualification, and certification of welders, include the following as examples only:

410.   Hunt routinely required welders to perform welds for which they were neither qualified nor certified in accordance with the terms of MIL-STD-248.  This fact was confirmed orally to Ms. Gonter by Hunt Quality Assurance Manager Wayne Aldrich on or about 7 March 2001.

411.   Welder trainee Brad Pastore was required by his superiors to perform welding on Military Division product prior to receiving any qualification or certification pursuant to MIL-STD-248.  This fact was confirmed by Pastore on or about 18 June 2001, and by Quality Assurance Manager Walter Krugel on or about 18 June 2001.

82

412.  After Krugel ordered that Pastore be prevented from welding on Military Division product until he was qualified and certified, he was found by Ms. Gonter to be performing finish welding on such product prior to completion of his training.  This occurred on or about 26 March 2001, and was confirmed by welder Bill Weikert.

413.  On 26 March 2001, welder trainee Pastore confirmed to Ms. Gonter that he was performing welds on Military Division product.  Welder Dennis Falzetta advised Ms. Gonter that he, Falzetta, was "signing off" for the welds as though he had performed them himself.

### b.  Certain Violations of MIL-STD-278

414.  Specific, systemic violations of MIL-STD-278, which governs the performance of welding on all Military Division product, include the following as examples only.

415.  Many manufacturing routers specify incorrect weld procedures.  This fact was confirmed by manufacturing employee Jack Stalnaker on or about 12 April 2001.

416.  Weld repair routers were frequently not generated at all.  Rather, weld repairs, called "dabs" in Hunt vernacular, were often performed by a welder based on the oral request of another worker and/or foreman.

417.  When weld repair routers were generated, they generally were not signed off by anyone but the welders themselves, precluding any meaningful verification of any operations set out on the router.  This fact was confirmed to Ms. Gonter by Bill Weikert on or about 27 March 2001.

418.  Hunt performs a type of welding called "hard facing" or "hard surfacing" on Level 1/SUBSAFE "525" valve bodies made of a copper-nickel alloy named Monel.

These valves form a large part of Hunt's product line.

419.    Hunt is required by drawing (and therefore by contract and by MIL-STD-278) to weld a buffer layer of Inconel to the seating area of the internal valve bodies.  The seating area is a critical surface.  The Inconel serves as an intermediate bonding surface to which a valve seat made of a third alloy, Stellite, is deposited by welding.

420.    The drawing requires machining of the Inconel buffer layer to a thickness of one-eighth inch with a tolerance of .014 inches. Dye penetrant examination is required of the Inconel buffer prior to addition of the Stellite seat, and another dye penetrant examination is required of the Stellite seat once it is welded.  This series of operations is essential to the fabrication of a conforming valve because Stellite cannot reliably be welded directly to Monel.

421.    The intermediate machining, thickness verification, and inspection of the Inconel buffer were routinely omitted.  Rather, Hunt's standard and long-standing practice was to weld the Stellite to the Inconel in its as-welded condition and without required machining, cleaning, thickness verification, and inspection.

422.    This standard practice was confirmed orally to Ms. Gonter by Hunt NDT Inspector Thomas Eakin and Hunt welder Bill Weikert on or about 17 March 2001.

423.    The effects of welding the Stellite seat material over the uncleaned, un-measured, untested, as-welded Inconel buffer is to forever prevent inspection of the Inconel-to-Monel weld, the thickness, consistency, and integrity of the Inconel layer, the thickness, consistency, and integrity of the Stellite layer, and the conformance to drawing requirements of the entire valve seat.

84

424.   Hunt welder Weikert advised Ms. Gonter on or about 17 June 2001 that the practice described in the preceding paragraphs had been in place for at least 10 years.

425.   Weikert stated to Ms. Gonter that he routinely skipped the dye penetrant inspection of the Inconel layer because it "cuts the time in half" to omit that inspection operation.

426.   Hunt's welders lacked the equipment and ability to measure the thickness of the Inconel layer, and added the Stellite layer without regard to the integrity of the Inconel.  On or about 17 March 2001, welder Weikert advised Ms. Gonter that the method he and his colleagues used to "measure" the Inconel layer was "guesswork."

427.   These practices of performing welds without complying with the required drawings, specifications, and procedures have occurred for many years.

428.   Hunt routinely required welders to perform weld repairs without first excavating discontinuities, including without limitation porosity, cracks, and voids.  This practice is nonconforming to MIL-STD-278 and risks hiding, rather than repairing, discontinuities so that they become hidden nonconformances.  This fact was repeatedly observed by Relators and was confirmed orally to Ms. Gonter by Hunt welder Bill Weikert on or about 12 March 2001 and by Hunt welder Dennis Falzetta on or about 12 March 2001.

429.   Hunt routinely required welders to apply welds directly over penetrant and developer remaining from liquid penetrant inspections, a practice in violation of, at least, MIL-STD-278 and MIL-STD-271.  This practice encapsulates foreign material—that is, the penetrant and developer—into the valve and fails to ensure that the defects

85

identified by the liquid penetrant inspection are properly repaired.  This highly-improper practice risks hiding, rather than repairing, such discontinuities so that they become hidden nonconformances.  This practice was repeatedly observed by Relators and was confirmed orally to Ms. Gonter by Hunt NDT inspector Thomas Eakin on or about 12 March 2001 and by Hunt welders Dennis Falzetta and William Weikert on or about 27 March 2001.

430.    These practices of performing welds without complying with the required drawings, specifications, and procedures have occurred since at least 1980 and continued until at least late 2001.  Hunt routinely performed weld repair operations with the purpose and effect of covering up defects on the valves, to include unacceptable porosity, cracks, and inclusions.  This practice, called in Hunt vernacular "dab welding," was admitted by Quality Assurance Specialist Jim Wolosyn to Ms. Gonter on or about 5 March 2001 and by Bill Weikert on or about 12 March 2001.  Mr. Weikert advised Ms. Gonter that he had followed this procedure as long as he had been at Hunt.

431.    Welding is not an appropriate corrective action for defects on the surface of the valve.  Such welds not only fail to correct the pre-existing defects, but mask them from later detection through nondestructive testing.

432.    In many cases where Hunt caused "dab welding" to be performed, neither the welding nor the defect was recorded.

433.    Valves which have been subjected to this highly improper "repair" procedure were routinely and falsely certified as being in compliance with drawing requirements.

434.    Weld repairs and inspections are required by contract, drawings, MIL-

86

STD-278, MIL-STD-271 and Hunt's own internal quality control procedures to be thoroughly documented.

435.    The systemic and repetitive failure to document weld repairs irrefutably demonstrates a severe breakdown in the quality, engineering, welding, and management functions of a facility manufacturing Level 1/SUBSAFE valves for the United States Navy.

436.    Quality Assurance Engineer Jim Wolosyn advised Ms. Gonter on or about 5 March 2001 that he conducted an investigation of Hunt's weld repair records and concluded that documentation existed for only 73 of an estimated 200 weld repairs for calendar year 2000, and only 14 out of an unknown number for 1999.  Wolosyn also stated that there is "no way to know" how many weld repairs actually were performed.

437.    It was Hunt's standard practice not to comply with the requirements of MIL-STD-278 with respect to the creation and maintenance of records which Hunt refers to as "Weld Joint Identification Records."  MIL-STD-278 § 4.1.3 requires, among other things, that a record be generated before any welding begins, and that every operation, to include welds, inspections, tests, machining cycles, etc., be "recorded prior to the commencement of the next operation."

438.    Hunt's standard practice was for years to prepare a computer-generated Weld Joint Identification Record after the entire series of operations had been completed, and in many cases to permit operations to proceed before the prior operation had been recorded.

439.    By way of example only, a draft of the Weld Joint Identification Record for Body SN JR-PB14581-2, Part No. 7108793-61AY, includes handwritten notations

87

pertaining to the alleged date on which a root-pass weld was inspected, as follows: "6/28 or 7/2 or 7/12 or 7/13 or" and indicates that the inspection dates on three of the four required final-layer inspections were in question.

440.    Of critical importance, the original computer-generated Weld Joint Identification Record purported to show that one of the final welds was performed after it was inspected—a physical impossibility.

441.    Welder Bill Weikert told Ms. Gonter on or about 8 February 2001 that welders do not make entries on weld joint records.

442.    Hunt welders repeatedly used the wrong welding rods while certifying that the correct welding rods were used.

443.    Hunt welders consistently failed to measure and maintain preheat temperatures prior to performing welding operations, in violation of approved Weld Procedures and MIL-STD-278.

### c.    Certain Violations of MIL-STD-271 and MIL-STD-2035

444.    Military Standard 2035, Nondestructive Testing Acceptance Criteria, at ¶ 7.2.1, requires that all NDT of welds be perfomed in a manner which includes a one-half inch zone, called the "heat affected zone."

445.    Hunt's NDT of welds did not take into account the heat affected zone.

446.    Hunt routinely failed to follow required practices and procedures regarding weld repairs, to include without limitation generating and following weld sketches which accurately describe the location, size, and extent of discontinuities.

447.    Specific examples of systemic nonconformances with MIL-STD-271 in connection with Hunt's welding NDT practices follow.

448. Hunt is required by drawing and contract to ensure that non-destructive evaluations by liquid penetrant inspection or 5x visual inspections are performed on root-pass welds which become covered by or subsumed within final welds.

449. Hunt regularly failed to perform these root-pass inspections, while falsifying documents purporting to show that such testing was performed. For example, on 22 March 2001, an unidentified person wrote the initials "TE," purporting to represent that Thomas Eakin had performed a visual inspection on root pass welds on three valve bodies. Thomas Eakin was not at work on 22 March 2001, and welder Bill Weikert, who performed the root-pass welds, advised Ms. Gonter that he did not perform the test and did not know who did.

450. Because Hunt routinely falsified records showing that root-pass NDT was performed when it was not, it is impossible to determine whether Hunt in fact performed any meaningful root-pass NDT. However, any meaningful audit or inspection of Hunt's welding records would have shown that they were incomplete and inconsistent.

451. Hunt personnel routinely welded label plates onto valves after their assembly was complete. This fact was confirmed to Ms. Gonter by welder Dennis Falzetta on or about 9 August 2001. Mr. Falzetta stated that name plates are welded on after assembly 90% of the time and that he had been arguing against this practice for 15 years.

452. This practice is contrary to drawing, which requires that label plates be affixed prior to assembly.

453. This practice also affects the integrity of the valves because it is impossible to ensure that the post-assembly welding has not affected the dimensional or

89

metallurgical properties of the valve internals and subjects o-rings to the risk of distortion on valves so equipped.

454.    Mr. Falzetta further stated that it is impossible to predict the effects of this practice on the valve due to the electrical grounding inherent in the welding operations: "They can weld that stem inside" and "never know it."

### 10.    Failure to Maintain Required Traceability of Parts

455.    Hunt's contracts with its vendors for Level 1/SUBSAFE components and materials require "complete chemical and mechanical heat lot traceability to the original mill" certification for the material.  This provision is a standard clause in Hunt's contracts, and is designated "Standard Clause A.2."

456.    Traceability of product supplied by Hunt vendors is a nondelegable requirement of the contracts between the United States and defendants General Dynamics Electric Boat and Northrop Grumman Newport News Shipbuilding, and each was required at all material times to take all steps necessary to ensure that Hunt had meaningfully flowed down traceability requirements and that Hunt's vendors complied therewith.

457.    Traceability is especially critical with respect to Level 1/SUBSAFE valves, but also is generally required by an effective quality system.

458.    Hunt routinely lost traceability of raw materials, bodies, stems, weld wires, assembled valves, and other components.

459.    Hunt routinely supplied fasteners for valves to Electric Boat without original mill certifications for the material.

460.    Hunt did not segregate parts by material or heat lot, keeping parts in bins

by material type only.

461.   Instead of keeping accurate records of a heat lot as it was routed through the plant, Hunt falsely matched up heat codes on parts with whatever certifications were available at the time of final inspection.

462.   If the part did not have a heat code marked on it, or if its heat code failed to match the available certification, Hunt personnel etched a new heat-code designation on the part.

463.   One example of this practice is part no. C80265, P.O. No. PPM003-070. On February 6, 2001 Hunt Quality Control Manager Wayne Aldrich falsified certificates of conformance by adding a lot number in order to match up the certificate with parts that had been delivered to the plant without proper certification.

464.   Material validation and certification is required to ensure that valve bodies and other components which are manufactured by Hunt's vendors are manufactured from the right materials.  Hunt personnel were not trained in the use of material validation technique. Equipment intended to be used for material validation had, as of October 2001, been broken for at least several months.

465.   Hunt did not maintain a serialized system for tracing the use of rejection reports.  As a consequence, rejection reports could and did disappear from the system after they had been written.

466.   Hunt routinely did not record reworks or corrective actions for parts supplied to the United States.  If a valve failed, the United States would have no way to know what previous defects existed or reworks were performed on the part.

467.   An example of this practice is part no. 434-211111, Sales Order No.

91

200989.  On 12 January 2001, inspector Ed Pittman discovered valves which had obviously been weld-repaired, but no weld repair had been documented.  Pittman wrote an Inspection Rejection Report ("IRR") for the valves, which, on information and belief, was voided by his superiors at Hunt.  The welds were not documented in the copies of the serialization log forwarded to Hunt Quality Assurance personnel.  When the Electric Boat source inspector discovered the weld repairs, false documents recreating the repairs and required nondestructive testing were created and added to the certification package.

468.    The Electric Boat source inspector accepted the valves with the weld repairs, knowing or having reason to know that the weld-repair records were all false.

469.    The defendants are required to submit formal written requests to deviate from required drawings, specifications, and procedures.  Hunt did not submit such requests, and either unilaterally deviated from required procedures or relied on oral corrective actions from Electric Boat and NNS which did not comply with government requirements.

470.    Defendants falsely certified the valves conformance with required drawings, specifications, and procedures without identifying the performed deviations.

471.    Hunt did not maintain records of when valves were shipped.  Hunt's recorded "ship" date routinely referred to the date the valve was paid for through progress billing.  Many valves were paid for long before assembly and shipment of the valve.

472.    This practice of deviating from required procedures regarding the traceability of parts supplied to the United States has occurred since at least 1987 and

92

was ongoing when Relators were fired.

### 11. Unqualified Personnel

473. The contracts between each of the prime-contractor defendants and Hunt, as well as Hunt's quality system, require that operators and inspectors are certified to perform the procedures, tests, and inspections necessary to complete the manufacture and assembly of the parts.

474. Hunt routinely allowed improperly certified operators and inspectors to perform these functions.

475. Hunt managerial personnel, to include without limitation Aldrich and Gorby, routinely ordered unqualified and uncertified employees to perform dye penetrant inspections.

476. Uncertified and unqualified personnel who performed dye penetrant inspections included at least the following:

| Employee | Job |
| --- | --- |
| Neil Van New Kurt | Janitor |
| Jay Crawford | Handyman |
| Andy Fitch | Mill Line |
| Brad Pastore | Welder |

477. Thomas Eakin, Hunt Level II NDT inspector, confirmed orally to Ms. Gonter that unqualified and uncertified personnel were ordered to perform dye penetrant inspections.

478. Hunt represented that Wayne Aldrich was certified as a Level III inspector. However, Aldrich's purported Level III credentials were obtained based on Aldrich taking a test that he wrote himself, and which was then "graded" by his boss and friend, Defendant Lawrence Kelly.

479.   Hunt ignored directives in or about early 2000 from Electric Boat suspending the certification of NDT inspector Tommy Eakin, after which suspension Wayne Aldrich falsely certified NDT as a Level III Inspector when he did not in fact perform such testing.

480.   Hunt Quality Control Inspector James Wolosyn advised Ms. Gonter on or about 26 March 2001, that Mr. Eakin could not properly interpret the accept/reject standards when administering dye penetrant examinations.  Mr. Wolosyn also told Ms. Gonter that Mr. Eakin had not heard of or read Military Standard 2035, Nondestructive Testing Acceptance Criteria, as well as the Navy's acceptance criteria document NAVSHIPS 0900-LP-003-8000, until years after he began doing Hunt's dye penetrant inspections.

481.    Hunt allowed unqualified personnel to perform tests and inspections at least throughout the 1990s.

### 12.   Failure to Require Vendors to Conform to Contract, and Falsification of Vendor Certifications

482.   Hunt outsources certain procedures for the manufacture of valve parts.

483.   Hunt is obligated by the terms of its contracts with its prime contractors to ensure that each and every vendor it selects performs its work in full compliance with the drawings, specifications, and procedures required of Hunt by its customers.

484.   Vendors must have what Hunt refers to as "scan plans" for the procedures performed, and these scan plans must be approved by Hunt's customers.

485.   Instead of requiring vendors to submit scan plans for approval, Hunt's quality department developed the practice of appending the certification submitted by the vendor to include an approved scan plan number.

94

486.    Hunt's post-hoc edits to vendor certifications were made by affixing a label to the certification.  The typeface of the text on the label is different from that on the certification.  The date of the scan plan was often later than the date of the certification itself.  Wayne Aldrich admitted to Ms. Gonter on or about 9 April 2001 that he telefaxed a vendor certification from one Hunt fax machine to another in order to make the document "fuzzy," thereby hiding the fact that he had engaged in the practice described in this paragraph.  He referred to this as "something really nasty" and told Ms. Gonter that "[i]t works really well."  He also advised Ms. Gonter that he was "getting better at forgery.  So much better.  That makes my ego feel better."

487.    Hunt did not regularly audit its vendors in conformance with its quality procedures.

488.    These practices of falsely modifying vendor certifications and failing to monitor and audit vendors have occurred since at least 1996 and continued until at least late 2001.

489.    Electric Boat and NNS accepted and sold Hunt valves to the United States certified for conformance to government contract requirements despite actual knowledge, deliberate ignorance, and/or reckless disregard of the false practices described above.

### 13.    Allegations Regarding Production of $UF_6$ Valves

490.    Hunt has delivered hundreds of thousands of $UF_6$ valves to customers, including LMES/LMUS, primary contractor to the DOE and USEC for the operation and managment of nuclear gaseous infusion plants.

491.    None of these valves were manufactured in accordance with all contract

95

requirements.

492.    The manufacture, assembly, inspection, and testing of $UF_6$ valves is required to be performed in accordance with a quality-assurance program published by the American Society of Mechanical Engineers ("ASME"), designated Quality Assurance Requirements for Nuclear Facility Applications and referred to as "NQA-1."

493.    LMES/LMUS and its preedcessors MMES/MMUS were required to deliver $UF_6$ valves to the United States which were manufactured, assembled, inspected, and tested in conformance with a quality system which conformed to the requirements of NQA-1.  For example, the Request for Offer No. 119484 between LMES and Hunt provided that "The Seller shall maintain a quality program acceptable to the Buyer in accordance with the quality requirements set forth in this Order (including the specifications or drawings).  The quality program shall comply with, or be equivalent to, NQA-1, 1989."

494.    At no time within the limitations period did Hunt have a quality-assurance system in place which complied fully with the terms of NQA-1.

495.    Hunt was also required, as a matter of Hunt policy and contract terms, to comply precisely with Hunt's internal quality procedures in connection with the manufacture, assembly, testing, and inspection of  $UF_6$ valves.

### a.    Certain QC-21 Audit Violations

496.    Hunt Internal Quality Control Procedure QC-21 applies to all Hunt Military Division valves.

497.    QC-21 requires internal audits of Hunt's $UF_6$ capabilities.  This Procedure pertains to all Hunt operations, and was completely ignored by Hunt in the production of

all valves at issue in this case.  By way of example only, the following paragraphs demonstrate certain violations of QC-21 in the context of $UF_6$ production.

498.    Few, if any, internal audits were performed for, at least, the years 1997 and 1998.

499.    QC-21 requires audit findings to be addressed by Hunt management, and that corrective action be taken.

500.    Although an internal audit of sorts was performed in 1999 by Hunt employee James Wolosyn, Hunt management never responded in any way to the audit findings.  On or about 15 March 2001, Mr. Wolosyn advised Ms. Gonter that he gave his findings to Mr. Aldrich, and "for an entire year they sat on his desk."  Aldrich then rushed to answer the audits so that his failure to respond would not come up in a customer audit, but never effectuated meaningful corrective action.

501.    QC-1 also requires that Hunt perform audits of vendors from whom it purchases components and materials for use in $UF_6$ valves.

502.    Hunt routinely failed to perform any audits of vendors from whom it purchases components and materials for use in $UF_6$ valves.

### b.    Certain QC-6 Control of Non-Conforming Material Violations

503.    Hunt Internal Quality Control Procedure QC-6 applies to all Hunt Military Division operations.

504.    QC-6 requires that all material defects or nonconformance be properly reported and dispositioned.

505.    Over a period of many years, Hunt personnel wrote Internal Rejection Reports indicating that components and materials for use in $UF_6$ valves were received

97

with no heat traceability markings, thereby defeating required traceability.

506.   Hunt management responded to such IRRs by requiring floor personnel to mark the material with such heat codes as would match up with certifications Hunt intended to use, thereby falsely holding material out to be traceable when it was not.

507.   QC-6 also requires that material dispositioned as "scrap" be meaningfully scrapped so that it is impossible to reuse such material or place it back into production.

508.   In violation of QC-6, Hunt routinely maintained for many months stores of scrapped  components and materials for use in $UF_6$ valves in productions areas, in a locker, or in the materials store room.

509.   $UF_6$ valves include a component called a "packing nut."  Such nuts are part of the primary containment system for $UF_6$, as they hold the valve together when its stem is cycled out.

510.   At least 2,000 packing nuts, after having been subjected to an improper "cleaning" procedure known as "bright dip" in a nitric-sulfuric acid bath, failed to meet dimensional requirements due to the effect of the etching on the internal threads of the nuts.  This occurred in or about 1998.  Ms. Gonter was informed about this scheme by Hunt Engineer Dale Carrick on or about 19 June 2001, and Mr. Carrick confirmed it to Mr. Gonter, who was assigned substantial responsibility for the $UF_6$ program in Summer 2001.

511.   Rather than disposition the dimensionally-nonconforming nuts as dis-crepant pursuant to QC-6, Hunt management personnel conceived and caused execu-tion of a plan to "cold work" the nuts by squeezing them in a vice-like jig until they "fit."

512.   Mr. Carrick referred to the practice of "cold-working" the nuts as "not legal"

98

and stated that he reported it to Defendant Lawrence Kelly.  Carrick also advised that the "cold working" made cracks likely.

513.  Hunt's practice of "cold working" $UF_6$ packing nuts without performing a proper nonconforming materials analysis violated QC-6, as well as NQA-1.

514.  At least 2,000 $UF_6$ valve stems, some of which are now known to have had cracks, were dispositioned as "satisfactory" because the cracks were not visible to the naked eye and a valve assembled with such a stem passed hydrostatic testing. Hunt failed to investigate the root cause of the cracking and failed to perform any nondestructive testing to determine the extent of the problem.

515.  All the stems except for a handful with cracks visible to the naked eye, were installed in valves and delivered to customers.

516.  Hunt's conduct with respect to the cracked $UF_6$ valve stems violated QC-6 and NQA-1.

### c.  Certain QC Procedure AIT-1 Training Violations

517.  Hunt Internal Quality Control Procedure AIT-1, as well as NQA-1 and purchase order requirements, mandate that only Qualified Personnel perform manufacture, assembly, testing, and inspection operations on $UF_6$ valves.

518.  On information and belief, Hunt employees were not trained or certified for $UF_6$ valves until, at the earliest, 1997, despite the specific requirement of NQA-1 and AIT-1 that inspection, test, and nondestructive examination personnel be trained, qualified, and certified to work on $UF_6$ containment hardware.  The basis for this belief is that Hunt's personnel training files do not reflect any personnel training regarding the $UF_6$ program until 1997.

99

519.  Hunt employees were never adequately trained or certified in the NQA-1 requirements applicable to $UF_6$ valves.  Rather, training was treated by Hunt, to include Hunt Quality Assurance Manager Wayne Aldrich, as at best a formality.

520.  When Hunt employee Brad Pastore was asked by Relator Charles Gonter to describe the training he received for work as an inspector of $UF_6$ valves, he stated that you just have to be a "team player."

521.  In Summer 2001, Relator Charles Gonter was assigned to act as Hunt's representative in connection with an audit of Hunt's $UF_6$ capabilities.

522.  In preparing for that audit, Mr. Gonter encountered training materials indicating that several men who were supposedly trained as assemblers were reflected as being trained as inspectors.

523.  On information and belief, this occurred because Wayne Aldrich caused Hunt personnel to sign $UF_6$ training certificates in blank, only later filling them in to reflect the supposed skills they had been "trained" to deploy.

524.  At least some Hunt personnel were "certified" to work on the $UF_6$ project with no training at all.

525.  Hunt assigned deburring personnel with no testing or quality assurance training and who were not on the qualified personnel list to perform required hardness testing on $UF_6$ valve stems.

526.  Hunt required inspectors to sign off on hardness testing as though they had performed it themselves when in fact it had been performed by unqualified and uncertified personnel.

527.  The majority of hardness test certifications issued by Hunt to its $UF_6$

100

customers were not verified by any qualified inspection personnel.

### d.    Violations of ANSI N14.1 Requirements

528.    ANSI N14.1 requires that  $UF_6$  valve bodies be cleaned with a chlorinated hydrocarbon solvent, an example of which would be the commonly-used cleaning solvent trichloroethylene.

529.    Because the valves were not cosmetically satisfactory to Hunt when they were cleaned with a proper solvent, Hunt initiated the practice of causing a vendor to "clean" $UF_6$ valve bodies with a nitric/sulfuric acid bath.

530.    Nitric/sulfuric acid is not a chlorinated hydrocarbon solvent.

531.    Nitric/sulfuric acid is a chemical etchant which actually removes material from metals with which it comes into contact.

532.    Hunt's practice of cleaning $UF_6$ valve bodies with a nitric-sulfuric acid bath violates the requirements of ANSI N14.1, as well as Hunt's internal quality control requirements and NQA-1.

533.    All $UF_6$ valve bodies etched with nitric-sulfuric acid, and not washed with a chlorinated hydrocarbon solvent, are nonconforming.

534.    MMUS/LMUS required by purchase order mandate that Hunt deliver $UF_6$ valves to the United States which conformed to the requirements of Standard N14.1, published by the American National Standards Institute ("ANSI N14.1").

535.    At no time within the limitations period did Hunt deliver $UF_6$ valves to the United States which conformed to the requirements of American National Standard N14.1, published by the American National Standards Institute ("ANSI N14.1").

536.    Hunt $UF_6$ valve assemblers were permitted as standard practice to use

101

air-impact tools to cycle the valve stems on $UF_6$ valves in specific derogation of contract requirements.

537. Hunt $UF_6$ valve assemblers routinely used torque wrenches in the assembly of $UF_6$ valves which were not properly calibrated.

538. Hunt permitted non-certified and unqualified personnel, to include without limitation Hunt's janitor, to perform nondestructive examinations on thousands of $UF_6$ valve nuts during 2000 and 2001.

## COUNT I
## False Claims Act—Military Valves

539. The allegations of paragraphs 1 through 530 are realleged as if fully set forth herein.

540. Defendants Hunt, EB, NNS, and MORPAC, by and through their officers, agents, and employees, knowingly submitted or caused to be submitted, false or fraudulent claims for payment or approval to officers, employees, or agents of the United States Government in violation of 31 U.S.C. § 3729 (a)(1).

541. The claims were false because they certified to the United States or another contractor, within the terms of 31 U.S.C. § 3729(c), that product was being delivered to the United States which conformed to all contract requirements when that statement was false.

542. Defendants Hunt, EB, NNS, and MORPAC, by and through their officers, agents, and employees, knowingly made, used, or caused to be made or used, false records or statements to obtain Government payment of false or fraudulent claims in violation of 31 U.S.C. §§ 3729 (a)(2).

543. Defendant Lawrence Kelly knowingly made, used, or caused to be made

or used, false records or statements to obtain Government payment of false or fraudulent claims in violation of 31 U.S.C. §§ 3729(a)(2).

544.   Every request for progress payment, Certificate of Compliance, and DD-250 submitted by Hunt to any customer with respect to valves intended for use in vessels of the United States, or paid for by the United States for use by the militaries of other governments, which actually or impliedly certified that Hunt manufactured and/or assembled valves to drawing, quality, and Level 1/SUBSAFE requirements when it failed to do so, constitutes a violation of the False Claims Act.

545.   Every claim for payment submitted to the United States or another contractor by NNS, General Dynamics, and MORPAC for Hunt valves, or for Navy vessels or other systems which incorporated Hunt valves, under circumstances in which that contractor knew or should have known that Hunt had falsely certified conformance constitutes a violation of the False Claims Act.

546.   Each defendant acted with actual knowledge or reckless disregard for the truth or falsity of the claims submitted to them by Hunt.

547.   Each of the false statements made in each false claim to the United States or to another contractor had the potential to influence the United States's decision whether to pay the claim.

548.   Defendants violated the False Claims Act.

549.   The United States of America has been damaged as result of Defendants' violations of the False Claims Act.

### COUNT II
### False Claims Act Conspiracy—Military Valves

550.   The allegations of paragraphs 1 through 541 are realleged as if fully set

103

forth herein.

551.   Hunt Valve Company and Northrop Grumman Newport News Shipbuilding entered into tacit and explicit agreements pursuant to which, *inter alia,* Hunt supplied, and NGNNS accepted, obviously-false certification documents and nonconforming submarine and other valves to NGNNS, and NGNNS accepted those documents and valves as though they were conforming and so represented to the United States.

552.   Hunt Valve Company and Northrop Grumman Newport News Shipbuilding conspired to defraud the United States in violation of the False Claims Act, 31 U.S.C. § 3729(c).

553.   The United States of America has been damaged as a result of Defendants' violations of the False Claims Act.

**COUNT III**
**False Claims Act Conspiracy—Military Valves**

554.   The allegations of paragraphs 1 through 545 are realleged as if fully set forth herein.

555.   Hunt Valve Company and Northrop Grumman Newport News Shipbuilding entered into tacit and explicit agreements pursuant to which, *inter alia,* Hunt supplied, and NGNNS accepted, obviously-false certification documents and nonconforming submarine and other valves to NGNNS, and NGNNS accepted those documents and valves as though they were conforming and so represented to the United States.

556.   Hunt Valve and General Dynamics Electric Boat conspired to defraud the United States in violation of the False Claims Act, 31 U.S.C. § 3729(c).

557.   The United States of America has been damaged as a result of Defend-

104

ants' violations of the False Claims Act.

## COUNT IV

### False Claims Act Conspiracy—All Stainless "Distributorship"

558.   The allegations of paragraphs 1 through 549 are realleged as if fully set forth herein.

559.   Hunt Valve, General Dynamics Electric Boat, All-Stainless, Inc., and Northrop Grumman Newport News Shipbuilding conspired to defraud the United States in violation of the False Claims Act, 31 U.S.C. § 3729(c) by entering into a fictitious distributorship arrangement pursuant to which, at the direction of GDEB, Hunt and All-Stainless falsely represented that All-Stainless was a distributor of Hunt Valves, which valves were accepted by GDEB and NGNNS.

560.   The United States of America has been damaged as a result of Defendants' violations of the False Claims Act.

## COUNT V
### False Claims Act—UF$_6$ Valves

561.   The allegations of paragraphs 1 through 552 are realleged as if fully set forth herein.

562.   Every Certificate of Compliance submitted by Hunt to MMUS and/or LMUS/LMES in connection with the sale of UF$_6$ valves is a false document intended to be and in fact used to get a false claim paid.

563.   Every claim for payment by MMUS and/or LMUS/LMES to the United States which included a request for payment for Hunt-manufactured UF$_6$ valves is a false claim for payment.

564.   Defendant acted with actual knowledge or reckless disregard for the truth

or falsity of the claims submitted to them by Hunt.

565. Defendant violated the False Claims Act.

566. The United States of America has been damaged as result of Defendants' violations of the False Claims Act.

## COUNT VI
### Retaliation against Tina Marie Gonter

567. The allegations of paragraphs 1 through 558 are realleged as if fully set forth herein.

568. During her employment at Hunt, Ms. Gonter discovered that Hunt, its management, and the contractors named herein, were engaged in false schemes by which product was knowingly delivered to the United States which was not conforming to contract, drawing, quality, and specification requirements.

569. Ms. Gonter reasonably believes that this conduct places in danger the safety of American service personnel and the personnel in facilities which use Hunt's $UF_6$ valves. Further, she believed and continues to believe that such conduct is likely to cause a hazard to public health or safety and/or was felonious.

570. Ms. Gonter brought this information to the attention of her superiors at Hunt, including defendant Kelly, who has since pleaded guilty to defrauding the United States based upon Ms. Gonter's reporting of his activities, and repeatedly voiced her objections regarding the schemes that were being perpetuated at Hunt.

571. Ms. Gonter's efforts were firmly resisted and rejected, and did not result in any effective change in Defendants' false schemes. Rather, her efforts resulted in a negative reaction from Hunt's management, including without limitation defendant Kelly,

in which she was told that her quality assurance functions were interfering with Hunt's production goals.

572.   Ms. Gonter was constantly pressured to disregard quality assurance in order to meet those production goals and was reprimanded in front of other Hunt personnel by defendant Kelly when she did not do so.

573.   Ms. Gonter was prevented from carrying out quality assurance functions by Defendants' gross misconduct and illegal actions.

574.   On August 23, 2001, defendant Kelly met with Ms. Gonter and Linda Butcher, a Human Resources representative, in which which he fired Ms. Gonter's.

575.   Kelly told Ms. Gonter that "because of our operational issues and our performance results, it's been mandated to me that I do an extensive cut.  And it affects your job."

576.   Ms. Gonter asked Kelly if there had been problems with her work, to which he responded that "it's not a performance issue."

577.   No other employee was terminated as a result of the "extensive cut" referenced by Mr. Kelly.

578.   On August 27, 2001, Hunt announced an "organizational change" allegedly necessitated by "continuing operational performance issues . . . driven by excessive scrap and rework."  As a result of the organizational change, Kenneth  Meyer was given supervision of the quality control and quality assurance functions in addition to his previous engineering responsibilities, with the new title "Director of Engineering and Quality."

579.   After Ms. Gonter was fired by defendant Kelly, several employees

107

expressed to Charles Gonter that they believed she had been fired in retaliation for her efforts to report and correct the false schemes being perpetuated at Hunt.

580.    Final inspector Ed Pittman stated that it was "easier to get rid of her than to go back and try to fix the problem with the scrap."

581.    Inspector Dick Cook stated that Ms. Gonter "wanted to do things the right way."

582.    NDT Inspector Thomas Eakin stated that Hunt "don't [sic] do anything the right way."

583.    Mill line employee Andrew Fitch stated that Tina was working to "identify the problems and get them straight," and that she was "doing her job and doing it well," but was fired "because she did her job."

584.    Inspector Dennis Jones observed that Ms. Gonter "got it" because "they didn't want somebody to show them where the problems were at.  They don't like people to know more than they do."

585.    Ms. Gonter was fired because of her lawful acts undertaken in furtherance of Relators' *qui tam* action pursuant to 31 U.S.C. § 3729 *et seq.*, including investigation for, initiation of, testimony for, or assistance in this action, in violation of 31 U.S.C. § 3730(h).

586.    Ms. Gonter is entitled to all relief necessary to make her whole and to damages resulting to her reputation and continued career opportunities as a result of Hunt's illegal conduct.

587.    All actions undertaken by Ms. Gonter that gave rise to her firing, as well as her actions in furtherance of Relators' *qui tam* action under the False Claims Act were

taken in an attempt to assure compliance with the terms of the government contract requirements pertaining to the delivery of Hunt product to the United States, and to ensure the safety of American service personnel and personnel in facilities which use Hunt's $UF_6$ valves.

588.   Hunt's and Kelly's discharge of Ms. Gonter was designed to threaten, harass, and discriminate against her in violation of 31 U.S.C. § 3730(h).

### Count VII
### Violation of Ohio Public Policy—Tina Gonter

589.   The allegations of paragraphs 1 through 580 are realleged as if fully set forth herein.

590.   Hunt is required by the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and Ohio Revised Code § 2921.13 to refrain from knowingly making false statements to representatives of the United States concerning compliance with the requirements of contracts for the delivery of valves and other Hunt product.

591.   Hunt has a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, initiation of, testimony for, or assistance in an action filed under the False Claims Act.

592.   Hunt is required by Ohio Revised Code § 4113.52 to refrain from taking retaliatory actions against employees who report potential violations of law which are likely to cause a hazard to public health or safety or which may be a felony.

593.   Hunt's actions in violation of the terms of its contracts pose a hazard to the public health and safety, including the health and safety of American military personnel and personnel in and around facilities which use Hunt's $UF_6$ valves, and

is reasonably believed to constitute felonies.

594. Hunt's and Kelly's wrongful discharge of Ms. Gonter for reporting information regarding Defendants' false practices and for attempting to bring Hunt into compliance with its contract requirements and specifications violates Ohio public policy.

595. Hunt's gross misconduct toward Ms. Gonter in requiring her to work in an atmosphere pervaded by fraud and misconduct and in terminating her because her her objections thereto was characterized by a spirit of ill will, hatred, or malice.

596. Hunt's retaliatory actions against Ms. Gonter violate Ohio public policy and caused her harm.

### Count VIII
### Retaliation against Charles William Gonter

597. The allegations of paragraphs 1 through 588 are realleged as if fully set forth herein.

598. During his employment at Hunt, Mr. Gonter discovered that Hunt, its management, and the contractors named herein, were engaged in fraudulent schemes by which product was knowingly delivered to the United States which was not conforming to contract, drawing, and/or specification requirements.

599. Mr. Gonter believed and continues to believe that this conduct places in danger the safety of American service personnel and the personnel in facilities which use Hunt's $UF_6$ valves. Further, he believed and continues to believe that such conduct is likely to cause a hazard to public health or safety and/or may be a felony.

600. Mr. Gonter brought this information to the attention of his superiors at Hunt and repeatedly voiced his objections to his superiors regarding the schemes that

110

were being perpetuated at Hunt. His efforts were firmly resisted and rejected, and did not result in any effective change in Defendants' false practices.

601.   Both Tina and Charles Gonter provided the information regarding Defendants' schemes, as alleged herein, to the United States. Thereafter, the United States Department of Defense Office of Inspector General, United States Department of Energy Office of Inspector General, Nuclear Regulatory Commission Office of Investigations, and Naval Criminal Investigative Service, on September 17, 2001, executed a search warrant on Hunt's premises which resulted in the seizure of a large volume of documents and other evidence from Hunt.

602.   In the hours prior to the execution of the search warrant, Mr. Gonter was personally handed a letter by Hunt Commercial Division Vice President Robert Funk congratulating him for outstanding job performance regarding audits of the $UF_6$ program and awarding him a $250.00 bonus. Mr. Gonter never received any negative feedback regarding his job performance.

603.   In August 2001, Ms. Gonter was told by Hunt Military Division Vice President, defendant Lawrence Kelly, that "You know I love Bill. And I really realize that he's done a wonderful job. Recently he's done a super job."

604.   After the execution of the warrant, however, Mr. Gonter noticed a major change in the demeanor of Hunt management and other employees towards him, including the omission of his name from electronic mail messages.

605.   On or about September 21, 2001, Mr. Gonter attended an "all hands" meeting at which a Hunt employee said words to the effect that if he found out who had turned Hunt in to the government, he would find them and take care of the problem

111

himself.

606.   On September 21, 2001, Mr. Gonter informed defendant Kelly in writing of this retaliatory conduct as a result of his report of Defendants' false practices.  That same day, Mr. Gonter also orally informed Quality Control Manager Walt Kruegel of the retaliatory conduct as a result of his report of Defendants' false practices.

607.   Despite Mr. Gonter's requests that such conduct be stopped, Hunt management and employees continued to treat Mr. Gonter in a retaliatory manner.  Mr. Gonter was isolated and ignored by other employees, was ostracized from day-to-day conversations and meetings, would not receive even routine responses to electronic mail messages sent to his supervisors, and was required to make a daily written report to his supervisor Ken Meyer on the details of his daily work activities (though no other employee was required to make such a report and he had never been previously required to do so).  Mr. Gonter continued to report and voice his objection to ongoing fraudulent practices at Hunt, and was met with increased resistance and outright hostility, including from his supervisor Ken Meyer who told Mr. Gonter he viewed such reports as an "implied threat."

608.   On or about October 12, 2001, Charles Gonter was constructively discharged when he was forced to leave Hunt as a result of the hostile work environment created by Hunt management and employees upon learning that Mr. Gonter had cooperated with the Department of Defense in its investigation of Hunt.

609.   Charles Gonter was retaliated against and constructively discharged because of his lawful acts undertaken in furtherance of Relators' *qui tam* action pursuant to 31 U.S.C. § 3729 *et seq.*, including investigation for, initiation of, testimony for,

112

or assistance in this action, in violation of 31 U.S.C. § 3730(h).

610.   All actions undertaken by Mr. Gonter that gave rise to his discharge as well as his actions in furtherance of Relators' *qui tam* action under the False Claims Act were taken in an attempt to assure compliance with the terms of the government contract requirements pertaining to the delivery of Hunt product to the United States, and to ensure the safety of American service personnel and personnel in facilities which use Hunt's $UF_6$ valves.

611.   Hunt's constructive discharge of Mr. Gonter was designed to threaten, harass, and discriminate against him in violation of 31 U.S.C. § 3730(h).

### Count IX
### Violation of Ohio Public Policy—Charles Gonter

612.   The allegations of paragraphs 1 through 603 are realleged as if fully set forth herein.

613.   Hunt is required by the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and Ohio Revised Code § 2921.13 to refrain from knowingly making false statements to representatives of the United States concerning compliance with the requirements of contracts for the delivery of valves and other Hunt product.

614.   Hunt has a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, including investigation for, initiation of, testimony for, or assistance in an action filed under the False Claims Act.

615.   Hunt is required by Ohio Revised Code § 4113.52 to refrain from taking retaliatory actions against employees who report potential violations of law which are likely to cause a hazard to public health or safety or which may be a felony.

113

616. Hunt's actions in violation of the terms of its contracts pose a hazard to the public health and safety, including the health and safety of American military personnel and personnel in and around facilities which use Hunt's $UF_6$ valves, and is reasonably believed to constitute felonies.

617. Hunt's wrongful discharge of Mr. Gonter for reporting information regarding Defendants' false practices and for attempting to bring Hunt into compliance with its contract requirements and specifications violates Ohio public policy.

618. Hunt's gross misconduct toward Mr. Gonter in requiring him to work in an atmosphere pervaded by fraud and misconduct and in constructively terminating him because of his objections thereto was characterized by a spirit of ill will, hatred, or malice.

619. Hunt's retaliatory actions against Mr. Gonter violate Ohio public policy and caused him harm.

### Prayer for Relief

**WHEREFORE,** Relators, on behalf of themselves and the United States Government, pray:

1. That the Court enter judgment against defendants in an amount equal to three times the amount of damages the United States Government sustained because of their actions, plus a civil penalty of $10,000 for each false claim made on or before 28 September 1999 and $11,000 for each false claim made on or after 29 September 1999, together with the cost of this action, with interest, including the cost to the United States Government for its expenses related to this action;

2. That Relators be awarded all costs incurred, including their attorney fees;

114

3.     That Relators be awarded 30% of the proceeds of any judgment, verdict, or settlement upon Counts I—V;

4.     That in connection with her federal retaliation claims stated against defendant Hunt in Count VI, Tina Gonter be reinstated to her position with the same seniority status she would have had but for the discrimination, two times the amount of back pay with interest, and compensation for special damages, to include without limitation attorney fees and litigation costs;

5.     That in connection with her claim that Hunt violated Ohio public policy set out in Count VII, Ms. Gonter be awarded compensatory and punitive damages;

6.     That in connection with his retaliation claim stated against defendant Hunt in Count VIII, Charles W. Gonter be reinstated to his position with the same seniority status he would have had but for the discrimination, two times the amount of back pay with interest, and compensation for special damages, to include without limitation attorney fees and litigation costs;

7.     That in connection with his claim that Hunt violated Ohio public policy set out in Court IX, Mr. Gonter be awarded compensatory and punitive damages;

8.     That a trial by jury be held on all issues; and

9.     That the United States and Relators receive all relief at law and in equity to which they may reasonably appear entitled.

Respectfully submitted,

_____
Frederick M. Morgan, Jr. (0027687)
Jennifer M. Verkamp (0067198)
Daniel Volkema (0012250)
VOLKEMA, THOMAS, MILLER,
BURKETT, SCOTT & MERRY LPA
700 Walnut Street, Suite 400
Cincinnati, Ohio 45202
Telephone: (513) 651-4400
Fax: (513) 651-4405
Email: rmorgan@vt-law.com
        jverkamp@vt-law.com
        dvolkema@vt-law.com

Jury trial demanded.

_____
Frederick M. Morgan, Jr.

116